1  Lazaro E. Fernandez, Esq. (SBN: 134430)
Law Office of Lazaro E. Fernandez, Inc.
2  3600 Lime St., Ste. 614
Riverside, CA 92501
3  T: (951) 684-4474
F: (951) 684-4625
4  E-mail: lef17@pacbell.net

5  Attorneys for Plaintiff
JUDDY OLIVARES and
6  ERIC PANITZ

7

8                    UNITED STATES BANKRUPTCY COURT

9            CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

10

11

| | |
|---|---|
| In re: SAM DANIEL DASON, dba SAM DANIEL DASON DDS, A Professional Dental Corporation, and GREETA SAM DASON,<br><br>Debtors.<br>_____<br><br>JUDDY OLIVARES AND ERIC PANITZ, ESQ.,<br><br>Plaintiffs,<br><br>v.<br><br>SAM DANIEL DASON, dba SAM DANIEL DASON DDS, A Professional Dental Corporation, dba COLTON DENTAL GROUP,<br><br>Defendant. | Bk. Case No. 6:16-bk-11635-MH<br><br>Chapter 7<br><br>Adv. Case No.:<br><br>COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT [11 U.S.C. §§ 523(a)(6)] AND FOR ATTORNEY'S FEES<br><br>Date:<br>Time: [TO BE SET BY SUMMONS]<br>Place: |

TO THE HONORABLE MARK HOULE, UNITED STATES BANKRUPTCY JUDGE:

Juddy Olivares and Eric Panitz, Esq. (Collectively "Plaintiff"), through their attorneys of

record, Law Office of Lazaro E. Fernandez, Inc. complain against Sam Daniel Dason, dba Sam

Daniel Dason DDS, A Professional Dental Corporation, dba Colton Dental Group ("defendant")

to determine the dischargeability of a debt owed Plaintiff, and they respectfully represent:

**STATEMENT OF JURISDICTION, PARTIES AND VENUE**

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. section 1334(a)[1] and (b) and 28 U.S.C. section 157(a) and (b).  The claims for relief in this complaint are core proceedings pursuant to 28 U.S.C. section 157(b)(2)(I).

2. Juddy Olivares ("Olivares") and Eric Panitz, Esq. ("Panitz") are the plaintiffs in this adversary proceeding.

3. Venue for each claim for relief in this adversary complaint is appropriate pursuant to 28 U.S.C. section 1409(a).

4. This adversary proceeding arises in the Chapter 7 case of *In re Sam Daniel Dason, dba Sam Daniel Dason DDS, A Professional Dental Corporation, and Greeta Sam Dason*, case number 6:16-bk-11635-MH, currently pending in the Riverside  Division of the United States Bankruptcy Court for the Central District of California.

**I.**

**STATEMENT OF FACTS**

1. Plaintiff, Juddy Olivares ("Olivares" or "Plaintiff"), is, and all times herein mentioned was, an individual residing in the County of San Bernardino, State of California.  Plaintiff Eric Panitz, Esq. is a duly licensed California attorney, and represented Olivares in her state court lawsuit against Defendant.

2. Plaintiff alleges that Defendant, Sam Dason ("Dason" or "Defendant") is, and all times herein mentioned was, an individual residing in the County of San Bernardino, State of California.  He is a debtor in the above-captioned Chapter 7 case, and he is a defendant in the above-captioned adversary proceeding.  Plaintiff is informed and believes and based thereon alleges that Dason is the owner of CDG and is a managing agent of CDG.  Plaintiff is informed and believes and based thereon alleges that Sam Daniel Dason, DDS, a Professional Dental

---

[1]Unless specified otherwise, all chapter and section references are to title 11 of the United States Code, commonly referred to as the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  All "Rule" referenced are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  All "Civil Rule" references are to the Federal Rules of Civil Procedures.  All "Local Rule" references are to this district's Local Bankruptcy Rules.

Complaint

\\LAWSERVER\Apps\Karina\My Files\Panitz, E\Dason\Pleadings\Apps+Mtns\Adv\Complaint\Adv. Complaint.wpd

1  Corporation doing business as Colton Dental Group ("CDG" or "Defendant"), is, and at all times

2  herein mentioned was, a professional corporation duly organized and existing under the laws of

3  the State of California, and is, and, at all times herein mentioned was, an employer in the State of

4  California, with at least five (5) employees.  CDG does business in the County of San

5  Bernardino and is subject to suit under the California Fair Employment and Housing Act

6  ("FEHA"), Government Code section 12900, et seq.

7      3.  Since October of 2010, OLIVARES was working for CDG as a dental assistant and

8  back office manager at the Colton, California facility. Olivares was paid $11.00 per hour.

9      4.  Throughout Olivares's employment with CDG, Olivares worked full time and often

10  over 8 hours per day.  Despite this, Olivares was not paid for the hours she worked in excess of 8

11  hours per day, and Olivares was not allowed to take rest breaks as required by the California

12  Labor Code.

13      5.  In addition, throughout Olivares's employment, Olivares was subjected to offensive

14  sexual comments and inquiries, and other unwelcome sexually based, offensive conduct by

15  Defendant Dason, who owns CDG.  Specifically, the owner, Defendant Dason, would

16  periodically make sexual jokes, sexual comments, leer at her, and inquire about private sexual

17  topics.  Each time Dason said something inappropriate, Olivares told her manager, Cesar

18  Espinoza, but he repeatedly failed to take sufficient action to prevent Dason from continuing to

19  make inappropriate sexual comments and jokes.

20      6.  Thereafter, beginning on or about April 2012, Olivares was subjected to repeated

21  unwelcome sexual touching at the hands of Defendant Dason.

22      7.  In April 2012, as Olivares was developing an x-ray during a root canal, Dason

23  grabbed Olivares' buttocks.  After the root canal, Dason apologized, and promised not to do it

24  again, and Olivares reported the incident to her manager, Espinoza.

25      8.  Several months later, in June or July 2012, as Olivares attempted to turn off an air

26  conditioner at the end of the day, Dason grabbed Olivares's buttocks and laughed.  In response,

27  Olivares again went to her manager, Espinoza, and related what had happened.  Espinoza told

28  Olivares to talk to Dason, but she refused.

3

Complaint

9.   Then, in November 2012, as Olivares reached for gloves, Dason again grabbed Olivares's buttocks.  One week later, as Dason was leaving the office, Dason grabbed Olivares's right breast and he then walked out the door.

10.   On December 7, 2012, Olivares confronted Dason about touching her breast and buttocks.  In response, Dason stated that because Olivares had an attractive smile, he slipped, and it was hard for him to stay away.  Dason apologized and once again promised to try not to behave in an inappropriate manner.

11.   Then on January 9, 2013, as Olivares requested a $3.00 per hour raise, Dason stated that Olivares's raise would be dependent upon her agreeing to go to Las Vegas with him.  At that time, Dason told Olivares that his wife was going to India in six months regarding something to do with her mother.  Olivares was speechless, and did not respond.

12.   Espinoza knew that Olivares intended to ask Dason for a raise, and after they were apart, Espinoza asked Olivares what had happened.  Olivares informed Espinoza what Dason had said, and Espinoza advised Olivares to agree to go to Vegas, accept the raise, and then later refuse to go because of Olivares's daughter.  Olivares did not follow Espinoza's advice.

13.   Finally, on January 16, 2013, Olivares again requested a raise, and Dason insisted on discussing her raise outside the office over lunch.  Olivares responded that she did not feel comfortable going out to lunch with Dason, and could they just discuss her raise in the office.  Dason replied that he did not have to give her a raise, and that Olivares's raise would be postponed until she agreed to go out to lunch with him.  In response, Olivares told Dason that she would not go out to lunch with him. Dason then told Olivares that he was trying to get on a personal level with her, and Olivares was not letting that happen.  Dason also said that lunch was now off the table, and that he would make it very difficult for Olivares to continue to work there.

14.   The following day, on January 17, 2013, Dason made Olivares's work day intolerable by repeatedly questioning her every action and severely criticizing her work.  Olivares complained to Espinoza, but he failed to take any action to stop Dason.  At that point Olivares felt that she had no choice but to leave because she could not continue to work under these conditions.  Olivares left work early at about 3:00 p.m. and has not returned to work.

4

Complaint

15. The activities of the Defendant, as referenced herein-above, created a hostile, intimidating, and offensive working environment. In retaliation for her failure to engage in the sexual banter with Defendant, and in retaliation for her complaints, and in retaliation for her refusal to engage in a sexual relationship with Dason, Olivares was constructively terminated on January 17, 2013.

16. As the result of Defendant's actions and omissions, Olivares has suffered loss of wages, loss of benefits, severe emotional distress and other economic and non-economic damages in an amount to be proven at trial.

17. Olivares filed a claim with the California Department of Fair Employment and Housing, which issued a "Right To Sue" letter to Olivares, dated January 22, 2013.

18. On or about April 12, 2013, Olivares filed a suit in San Bernardino County Superior Court against Sam Dason, Sam Daniel Dason, DDS, a Professional Dental Corporation doing business as Sam Daniel ("CDG") and DOES 1 through 100, inclusive. A true and correct copy of the state court complaint is attached hereto as Exhibit 1 and incorporated herein by reference.

19. On or about February 25, 2016, the San Bernardino County Superior Court held a trial with live witness testimony and documentary evidence from various parties and after said trial rendered judgment in favor of Olivares and Panitz. A true and correct copy of the entire transcript of the trial proceedings is attached hereto as Exhibit 2 and incorporated herein by reference.

20. On or about February 26, 2016, the San Bernardino County Superior Court entered a judgment in favor of Olivares and Panitz and against Dason and CDG in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94).

## II.

### FIRST CLAIM FOR RELIEF

### SECTION 523(a)(6)[HARASSMENT (GOVT. CODE §12940(j)(1))]

21. Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 20.

5

Complaint

1    22. CDG's owner, Sam Dason, acting in both his individual capacity, and in his capacity

2    as a managing agent and supervisor for CDG, engaged in the above-referenced actions with the

3    intent of harassing Olivares on account of her sex in violation of California Government Code

4    section 12940(j)(1). Despite their knowledge of the above mentioned harassment and the

5    knowledge of other supervisors and agents, CDG, failed to take immediate and appropriate

6    corrective action to prevent or stop the harassment. Furthermore, as the repeated incidents of

7    harassment occurred, CDG failed to take all reasonable steps to prevent such future harassment

8    from occurring. The above referenced acts of defendants were done intentionally with malice

9    and to deprive Plaintiff of her rights under the law and without just cause or excuse.

10    23. As a direct and proximate cause of Defendants' actions, Olivares suffered,

11    and continues to suffer, financial hardship, humiliation, mental anguish, mental and physical

12    pain, and other damages liquidated in the amount of one million seven hundred forty-two

13    thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and said debt is non-

14    dischargeable pursuant to section 523(a)(6).

### III.

### SECOND CLAIM FOR RELIEF

### SECTION 523(a)(6) [DISCRIMINATION (GOVT. CODE §12940(a))]

18    24. Plaintiff re-alleges and incorporates herein by this reference as though fully set forth

19    herein the allegations of paragraphs 1 through 20.

20    25. Dason discriminated against Olivares in terms, conditions, and privileges of

21    employment on account of her sex in violation of Government Code sections 12940 et. seq. The

22    above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff

23    of her rights under the law and without just cause or excuse.

24    26. As a direct and proximate cause of the actions alleged above, Olivares has suffered

25    and continues to suffer extreme physical and emotional distress, financial hardship, humiliation,

26    mental anguish, mental and physical pain, and other damages in an amount liquidated in the

27    amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-

28    four cents ($1,742,690.94) and said debt is non-dischargeable pursuant to section 523(a)(6).

6

Complaint

## IV.

## THIRD CLAIM FOR RELIEF

## SECTION 523(a)(6) [(FAILURE TO PREVENT DISCRIMINATION (GOV'T CODE SECTION 12940(k))]

27.  Plaintiff re-alleges and incorporates herein by this reference, as though fully set forth herein, the allegations of paragraphs 1 through 20.

28.  Defendant, Dason, as an employer failed to take reasonable steps to prevent discrimination from occurring which is in violation of Government Code section 12940(k).  The above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff of her rights under the law and without just cause or excuse.

29.  As a direct and proximate result of the defendant's and each of the actions alleged herein, Olivares has suffered and continues to suffer physical and emotional distress, financial hardship, wage losses, humiliation, mental anguish, mental and physical pain, and other damages in an amount liquidated in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and said debt is non-dischargeable pursuant to section 523(a)(6).

## V.

## FOURTH CLAIM FOR RELIEF

## SECTION 523(a)(6) [(RETALIATION (GOV'T CODE §12940(h))]

30.  Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 20.

31.  As the result of Plaintiff's complaints regarding her perceived acts of discrimination on the part of Dason, and due to her refusal to participate in a sexual relationship with Dason, Defendant Dason retaliated against Plaintiff in violation of Government Code section 12940(h) by failing to give her raises, and by making her workplace unbearable following Plaintiff's refusal to do what Dason demanded.  The above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff of her rights under the law and without just cause or excuse.

Complaint

32.  As a direct and proximate result of the Defendants' and each of their actions alleged herein, Olivares has suffered and continues to suffer extreme physical and emotional distress, financial hardship, wage losses, humiliation, mental anguish, mental and physical pain, and other damages in an amount one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and said debt is non-dischargeable pursuant to section 523(a)(6).

## VI.

### FIFTH CLAIM FOR RELIEF

### SECTION 523(a)(6) [FAILURE TO PAY WAGES IN A TIMELY MANNER]

33.  Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 20.

34.  Pursuant to Labor Code § 218 and 218.5, plaintiff may bring a civil action for unpaid wages directly against the employer in plaintiff's name without first filing a claim with the Department of Labor Standards Enforcement.

35.  Pursuant to Labor Code § 201, when defendant fails to pay wages due within three days of constructive termination, defendant is obligated to pay all wages plus penalties in the amount of one day's wages for each day said wages are not paid, up to a maximum of thirty days. In addition, Plaintiff is entitled to recover attorney's fees, other penalties, interest, and costs incurred in filing a lawsuit to collect said wages.

36.  On the day of Plaintiff's constructive termination of her employment, Plaintiff was not offered her paycheck in the time required to be paid pursuant to law and has not yet received all remuneration due to her. Defendant has failed and refused, and continues to fail and refuse, to pay Plaintiff amounts that are owed. Defendants' failure to pay Plaintiff wages accrued violates the provision of Labor Code § 201 and, therefore, subjects defendants to penalty wages.

37.  Plaintiff requests payment of wages due according to proof, penalty wages, interest, attorney's fees and costs pursuant to Labor Code § 201, and 218.5, as well as the assessment of any other statutory penalties against defendants in a sum as provided by the Labor Code and/or other applicable statutes.  The above referenced acts of defendants were done intentionally with

Complaint

1  malice and to deprive Plaintiff of her rights under the law and without just cause or excuse.

2      38.  As a direct and proximate result of the Defendants' and each of their actions alleged

3  herein, Olivares has suffered and continues to suffer extreme physical and emotional distress,

4  financial hardship, wage losses, humiliation, mental anguish, mental and physical pain, and other

5  damages in an amount one million seven hundred forty-two thousand, six hundred ninety dollars

6  and ninety-four cents ($1,742,690.94) and said debt is non-dischargeable pursuant to section

7  523(a)(6).

8  **VII.**

9  **SIXTH CLAIM FOR RELIEF**

10  **SECTION 523(a)(6) [FAILURE TO PAY OVERTIME PAY]**

11      39.  Plaintiff re-alleges and incorporates herein by this reference as though fully set forth

12  herein the allegations of paragraphs 1 through 20.

13      40.  Plaintiff is informed and believes and thereon alleges that during the period that she

14  was employed by defendant, Plaintiff regularly and routinely worked in excess of 8 hours in a

15  given work day.  As the result thereof, pursuant to California Labor Code sections 510 et. seq.,

16  and Industrial Welfare Commission Order 4-2001, Plaintiff was entitled to receive overtime pay

17  for each of the hours worked in excess of 8 hours per day.  Plaintiff is also entitled to recover

18  waiting time penalties pursuant to California Labor Code section 203, interest pursuant to

19  California Labor Code section 1194, and attorney's fees pursuant to California Labor Code

20  section 1194.3.  The above referenced acts of defendants were done intentionally with malice

21  and to deprive Plaintiff of her rights under the law and without just cause or excuse.

22      41.  As a direct and proximate result of the Defendants' and each of their actions alleged

23  herein, Olivares has suffered and continues to suffer extreme physical and emotional distress,

24  financial hardship, wage losses, humiliation, mental anguish, mental and physical pain, and other

25  damages in an amount one million seven hundred forty-two thousand, six hundred ninety dollars

26  and ninety-four cents ($1,742,690.94) and said debt is non-dischargeable pursuant to section

27  523(a)(6).

28  ///

# VIII.

## SEVENTH CLAIM FOR RELIEF

### SECTION 523(a)(6) [FAILURE TO PROVIDE REST BREAKS]

42.  Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 20.

43.  Plaintiff is informed and believes and thereon alleges that during the period that she was employed by defendants, Plaintiff worked each day for 8 hours or more without being provided rest breaks.  As the result thereof, pursuant to California Labor Code sections 226.7 et. seq., and Industrial Welfare Commission Order 4-2001, Plaintiff is entitled to payment for the hours in which she worked without receiving rest breaks required to be provided during the course of the work day.  Plaintiff is also entitled to recover waiting time penalties pursuant to California Labor Code section 203, interest pursuant to California Labor Code section 218.6, and attorney's fees pursuant to California Labor Code section 218.5.  The above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff of her rights under the law and without just cause or excuse.

44.  As a direct and proximate result of the Defendants' and each of their actions alleged herein, Olivares has suffered and continues to suffer extreme physical and emotional distress, financial hardship, wage losses, humiliation, mental anguish, mental and physical pain, and other damages in an amount one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and said debt is non-dischargeable pursuant to section 523(a)(6).

# IX.

## EIGHTH CLAIM FOR RELIEF

### SECTION 523(a)(6) [UNFAIR COMPETITION]

45.  Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 20.

46.  Defendant's acts constitute a continuing and ongoing unlawful activity prohibited by the Unfair Competition Laws set forth in Bus. & Prof. Code § 17200 et. seq.

10

47. Labor Code § 90.5(a) articulates the public policy of this State to vigorously enforce minimum labor standards, including the requirements of providing rest and meal breaks and other employment benefits pursuant to Labor Code § 1198. Labor Code §6300 et. seq. (The California Occupational Safety Health Act of 1973) was enacted to ensure safe and helpful working conditions in the State of California. Defendants' conduct of failing to allow for meal breaks and rest breaks are required by the State and Federal Laws and regulation constitutes were intended to constitute unfair competition and unlawful and unfair acts and practices within the meaning of the Unfair Competition Laws.

48. Through the wrongful and illegal conduct alleged herein, Defendants have acted contrary to the public policy of this State.

49. As a result of Defendants' violations of the Unfair Competition Law, it has unjustly enriched itself at the expense of Plaintiff, and the general public.

50. To prevent this unjust enrichment, Defendants should be required to disgorge their illegal gains and should be required to make restitution to Plaintiff.

51. Plaintiff also requests that this Court enter such orders or judgment as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair practices, as provided in the UCL, Bus. & Prof. Code § 17203, and for such other relief as set forth below.

52. Plaintiff is a "person" within the meaning of Bus. & Prof. Code § 17204 and has standing to bring this claim for injunctive and equitable relief because she has suffered direct financial injury.

53. Injunctive relief is necessary to prevent Defendants from continuing to engage in unfair business practices, as alleged herein. Defendants, and persons acting in concert with it, has done, or is now doing, and will continue to do or cause to be done, the above-described illegal acts unless restrained or enjoined by this Court.

54. The conduct of Defendants, as alleged herein, have been and continues to be deleterious to Plaintiff and the general public. By this action, Plaintiff seeks to enforce important rights affecting the public interest within the meaning of Code Civ. Proc. § 1021.5.

Complaint

55. Pursuant to Bus. & Prof. Code § 17203, Plaintiff, on behalf of herself and all other employees similarly situated requests injunctive relief, restitution and/or disgorgement of all sums obtained by Defendants in violation of Bus. & Prof. Code § 17200 et seq.

56. The above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff of her rights under the law and without just cause or excuse. As a direct and proximate result of the Defendants' and each of their actions alleged herein, Olivares has suffered and continues to suffer extreme physical and emotional distress, financial hardship, wage losses, humiliation, mental anguish, mental and physical pain, and other damages in an amount one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and said debt is non-dischargeable pursuant to section 523(a)(6).

## X.

## NINTH CLAIM FOR RELIEF

## SECTION 523(a)(6) [PENALTIES PURSUANT TO LABOR CODE § 2699]

57. Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 20.

58. As a result of the acts alleged above, Plaintiff seeks penalties under Labor Code § 2699, et seq. because of Defendant's violation of Labor Code §§ 201, 203, 226, 226.7, & 510, which call for civil penalties, which allow for private action under the Private Attorney's General Act (PAGA).

59. For each such penalty, Plaintiff is entitled to penalties in an amount to be shown at trial, subject to the following formula:

(a)    $100 for the initial violation per pay period.

(b)    $200 for each subsequent violation per pay period.

60. These penalties shall be allocated seventy-five percent (75%) to the Labor and Workforce Development Agency (LWDA) and twenty-five percent (25%) to the affected employee.

///

///

61.  Plaintiff sent a certified letter to the LWDA and Defendant as proscribed by the Code on January 23, 2013.  As no letter evidencing the LWDA's intention to investigate was received within thirty-three (33) calendar days, Plaintiff is entitled to commence a civil action as though the LWDA had not chosen to investigate pursuant to Labor Code § 2699.3(a)(2)(A).

62.  The above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff of her rights under the law and without just cause or excuse.  As a direct and proximate result of the Defendants' and each of their actions alleged herein, Olivares has suffered and continues to suffer extreme physical and emotional distress, financial hardship, wage losses, humiliation, mental anguish, mental and physical pain, and other damages in an amount one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and said debt is non-dischargeable pursuant to section 523(a)(6).

## XI.

## TENTH CLAIM FOR RELIEF

63.  Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 20.

64.  Despite the multipl and egregious violations by Dason of Olivares's rights as set forth above, and Olivares's multiple complaints and demands for cessation of same, said violations did not stop.  Subsequent to the entry of the state court judgment against Dason, he filed this Chapter 7 bankruptcy.  Olivares has had to retain counsel to prosecute this action and will incur attorneys' fees and costs in an attempt to recover the entirety of the state court judgment entered in her favor and against defendant.

## XII.

## PRAYER

WHEREFORE, Olivares and Panitz respectfully pray for money judgment and determination of nondischargeability of debt pursuant to section 523(a)(6) against Sam Daniel

Complaint
\\LAWSERVER\Apps\Karina\My Files\Panitz, E\Dason\Pleadings\Apps+Mtns\Adv\Complaint\Adv. Complaint.wpd

Dason, dba Sam Daniel Dason DDS, A Professional Dental Corporation, dba Colton Dental Group as follows:

### AS TO THE FIRST CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section 523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

5. For such other relief as the court deems just, equitable and proper.

### AS TO THE SECOND CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section 523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

5. For such other relief as the court deems just, equitable and proper.

### AS TO THE THIRD CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four

Complaint

cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section

523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

5. For such other relief as the court deems just, equitable and proper.

AS TO THE FOURTH CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount

of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four

cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section

523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

5. For such other relief as the court deems just, equitable and proper.

AS TO THE FIFTH CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount

of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four

cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section

523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

Complaint
\\LAWSERVER\Apps\Karina\My Files\Panitz, E\Dason\Pleadings\Apps+Mtns\Adv\Complaint\Adv. Complaint.wpd

5. For such other relief as the court deems just, equitable and proper.

## AS TO THE SIXTH CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section 523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

5. For such other relief as the court deems just, equitable and proper.

## AS TO THE SEVENTH CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section 523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

5. For such other relief as the court deems just, equitable and proper.

## AS TO THE EIGHTH CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section

Complaint
\\LAWSERVER\Apps\Karina\My Files\Panitz, E\Dason\Pleadings\Apps+Mtns\Adv\Complaint\Adv. Complaint.wpd

523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

5. For such other relief as the court deems just, equitable and proper.

AS TO THE NINTH CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section 523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

5. For such other relief as the court deems just, equitable and proper.

AS TO THE TENTH CLAIM FOR RELIEF:

1. For money judgment in favor of Olivares and Panitz and against Dason in the amount of one million seven hundred forty-two thousand, six hundred ninety dollars and ninety-four cents ($1,742,690.94) and a determination that said debt is non-dischargeable pursuant to section 523(a)(6) in this bankruptcy case;

2. For attorneys fees according to proof;

3. For costs of suit;

4. For prejudgment interest;

///

17

Complaint

\\LAWSERVER\Apps\Karina\My Files\Panitz, E\Dason\Pleadings\Apps+Mtns\Adv\Complaint\Adv. Complaint.wpd

5. For such other relief as the court deems just, equitable and proper.

Dated: August __22__, 2016

Respectfully submitted.
Law Office of Lazaro E. Fernandez, Inc.

By: _____
Lazaro E. Fernandez
Attorneys for Plaintiffs

18
Complaint

FILE COPY

Michael A. DesJardins (SBN 145970)
Eric A. Panitz (SBN 243877)
DesJardins & Panitz LLP
18000 Studebaker Road, Suite 700
Cerritos, California 90703
T: (562) 924-7800
F: (562) 924-7801
ep@djplawyers.com

Attorneys for Plaintiff
JUDDY OLIVARES

FILED
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

APR 1 2 2013

By_____ Deputy

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

JUDDY OLIVARES, an individual,

      Plaintiff,

vs.

SAM DASON, an individual, SAM DANIEL
DASON, DDS, A PROFESSIONAL
DENTAL CORPORATION, a California
corporation doing business as COLTON
DENTAL GROUP, and DOES 1 through 100,
inclusive,

      Defendants.

Case No.: CIVDS1300810

**VERIFIED FIRST AMENDED
COMPLAINT FOR DAMAGES FOR:**

1.  **HARASSMENT (GOV'T. CODE §
12940(j)(1));**

2.  **DISCRIMINATION (GOV'T.
CODE § 12940(a));**

3.  **FAILURE TO PREVENT
DISCRIMINATION (GOV'T.
CODE § 12940(k));**

4.  **RETALIATION (GOV'T. CODE
§ 12940(h));**

5.  **FAILURE TO PAY WAGES IN A
TIMELY MANNER (LABOR CODE § 201);**

6.  **FAILURE TO PAY OVERTIME
(LABOR CODE § 510);**

7.  **FAILURE TO PROVIDE REST
BREAKS (LABOR CODE § 226.7);**

8.  **UNFAIR COMPETITION IN
VIOLATION OF BUSINESS AND
PROFESSIONS CODE § 17200.**

9.  **PENALTIES PURSUANT TO
LABOR CODE § 2699**

**DEMAND FOR JURY TRIAL**

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 1

Exhibit "1" Page 1 of 19

### GENERAL ALLEGATIONS

1.      Plaintiff, JUDDY OLIVARES ("OLIVARES" or "Plaintiff"), is, and all times herein mentioned was, an individual residing in the County of San Bernardino, State of California.

2.      Plaintiff is informed and believes and thereon alleges that Defendant, SAM DANIEL DASON, DDS, A PROFESSIONAL DENTAL CORPORATION doing business as COLTON DENTAL GROUP ("CDG" or "Defendant"), is, and at all times herein mentioned was, a professional corporation duly organized and existing under the laws of the State of California, and is, and, at all times herein mentioned was, an employer in the State of California, with at least five (5) employees.  CDG does business in the County of San Bernardino and is subject to suit under the California Fair Employment and Housing Act ("FEHA"), Government Code section 12900, et seq. Plaintiff alleges that Defendant, SAM DASON ("DASON" or "Defendant") is, and all times herein mentioned was, an individual residing in the County of San Bernardino, State of California.  DASON is the owner of CDG and is a managing agent of CDG.

3.      Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, and therefore sue these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

4.      Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences and damages herein alleged, and that Plaintiff's injuries as herein alleged was proximately caused by defendants' acts or omissions.  At all times mentioned herein, each of the defendants was the agent and employee of each of the other defendants, and was, at all times herein mentioned, acting within the scope of said agency and employment.

5.      Since October of 2010, OLIVARES was working for CDG as a dental assistant and back office manager at the Colton, California facility. OLIVARES is paid $11.00 per hour.

6.      Throughout OLIVARES's employment with CDG, OLIVARES worked full time and often over 8 hours per day.  Despite this, OLIVARES was not paid for the hours she worked in excess of 8 hours per day, and OLIVARES was not allowed to take rest breaks as required by the California Labor Code.

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 2

7.     In addition, throughout OLIVARES's employment, OLIVARES was subjected to offensive sexual comments and inquiries, and other unwelcome sexually based, offensive conduct by Defendant DASON, who owns CDG.  Specifically, the owner, Defendant DASON, would periodically make sexual jokes, sexual comments, leer at her, and inquire about private sexual topics.  Each time DASON said something inappropriate, OLIVARES told her manager, Cesar Espinoza, but he repeatedly failed to take sufficient action to prevent DASON from continuing to make inappropriate sexual comments and jokes.

8.     Thereafter, beginning on or about April 2012, OLIVARES was subjected to repeated unwelcome sexual touching at the hands of Defendant DASON.

9.     In April 2012, as OLIVARES was developing an x-ray during a root canal, DASON grabbed OLIVARES's buttocks.  After the root canal, DASON apologized, and promised not to do it again, and OLIVARES reported the incident to her manager, Espinoza.

10.    Several months later, in June or July 2012, as OLIVARES attempted to turn off an air conditioner at the end of the day, DASON grabbed OLIVARES's buttocks and laughed.  In response, OLIVARES again went to her manager, Espinoza, and related what had happened.  Espinoza told OLIVARES to talk to DASON but she refused.

11.    Then, in November 2012, as OLIVARES reached for gloves, DASON again grabbed OLIVARES's buttocks.  One week later, as DASON was leaving the office, DASON grabbed OLIVARES's right breast and he then walked out the door.

12.    On December 7, 2012, OLIVARES confronted DASON about touching her breast and buttocks.  In response, DASON stated that because OLIVARES has an attractive smile, he slips, and it is hard for him to stay away.  DASON apologized and once again promised to try not to behave in an inappropriate manner.

13.    Then on January 9, 2013, as OLIVARES requested a $3.00 per hour raise, DASON stated that OLIVARES's raise would be dependent upon her agreeing to go to Las Vegas with him.  At that time, DASON told OLIVARES that his wife was going to India in six months regarding something to do with her mother.  OLIVARES was speechless, and did not respond.

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 3

14.    Espinoza knew that OLIVARES intended to ask DASON for a raise, and after they were apart, Espinoza asked OLIVARES what had happened.  OLIVARES informed Espinoza what DASON had said, and Espinoza advised OLIVARES to agree to go to Vegas, accept the raise, and then later refuse to go because of OLIVARES's daughter.  OLIVARES did not follow Espinoza's advice.

15.    Finally, on January 16, 2013, OLIVARES again requested a raise, and DASON insisted on discussing her raise outside the office over lunch.  OLIVARES responded that she did not feel comfortable going out to lunch with DASON, and could they just discuss her raise in the office.  DASON replied that he did not have to give her a raise, and that OLIVARES's raise would be postponed until she agreed to go out to lunch with him.  In response, OLIVARES told DASON that she would not go out to lunch with him. DASON then told OLIVARES that he was trying to get on a personal level with her, and OLIVARES was not letting that happen.  DASON also said that lunch was now off the table, and that he would make it very difficult for OLIVARES to continue to work there.

16.    The following day, on January 17, 2013, DASON made OLIVARES's work day intolerable by repeatedly questioning her every action and severely criticizing her work. OLIVARES complained to Espinoza, but he failed to take any action to stop DASON.  At that point OLIVARES felt that she had no choice but to leave because she could not continue to work under these conditions.  OLIVARES left work early at about 3:00 p.m. and has not returned to work.

17.    The activities of the Defendants, as referenced herein-above, created a hostile, intimidating, and offensive working environment. In retaliation for her failure to engage in the sexual banter with Defendants, and in retaliation for her complaints, and in retaliation for her refusal to engage in a sexual relationship with DASON, OLIVARES was constructively terminated on January 17, 2013.

18.    As the result of Defendants' actions and omissions, OLIVARES has suffered loss of wages, loss of benefits, severe emotional distress and other economic and non-economic damages in an amount to be proven at trial, but in no event less than $100,000.00 dollars.

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 4

Exhibit "1" Page 4 of 19

19.    OLIVARES has filed a claim with the California Department of Fair Employment and Housing, which has issued a "Right To Sue" letter to OLIVARES, dated January 22, 2013. A true and correct copy of the "Right To Sue" letter is attached hereto and incorporated herein as Exhibit "A."

**FIRST CAUSE OF ACTION**

**HARASSMENT (GOVT. CODE §12940(j)(1))**

**(AGAINST CDG, DASON, AND DOES 1-100)**

20.    Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 19.

21.    CDG's owner, SAM DASON, acting in both his individual capacity, and in his capacity as a managing agent and supervisor for CDG, engaged in the above-referenced actions with the intent of harassing OLIVARES on account of her sex in violation of California Government Code section 12940(j)(1). Despite their knowledge of the above mentioned harassment and the knowledge of other supervisors and agents, CDG, failed to take immediate and appropriate corrective action to prevent or stop the harassment. Furthermore, as the repeated incidents of harassment occurred, CDG failed to take all reasonable steps to prevent such future harassment from occurring.

22.    As a direct and proximate cause of Defendants' actions, OLIVARES has suffered, and continues to suffer, financial hardship, humiliation, mental anguish, mental and physical pain, and other damages in an amount to be proven at trial, but in no event less than $100,000.00 dollars.

23.    In addition to the above, OLIVARES has and continues to incur legal fees, costs, and other expenses in the prosecution of this matter.

24.    The above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff of her rights under the law and, therefore, entitle the Plaintiff to an award of punitive and exemplary damages.

///

///

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 5

## SECOND CAUSE OF ACTION

### DISCRIMINATION (GOVT. CODE §12940(a))

### (AGAINST CDG, AND DOES 1-100)

25.    Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 24.

26.    CDG discriminated against OLIVARES in terms, conditions, and privileges of employment on account of her sex in violation of Government Code sections 12940 et. seq.

27.    As a direct and proximate cause of the actions alleged above, OLIVARES has suffered and continues to suffer extreme physical and emotional distress, financial hardship, humiliation, mental anguish, mental and physical pain, and other damages in an amount to be proven at trial, but in no event less than $100,000.00 dollars.

28.    In addition to the above, OLIVARES has and continues to incur legal fees, costs, and other expenses in the prosecution of this matter.

29.    The above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff of her rights under the law and, therefore, entitle the Plaintiff to an award of punitive and exemplary damages.

## THIRD CAUSE OF ACTION

### (FAILURE TO PREVENT DISCRIMINATION (GOV'T CODE SECTION 12940(k))

### (AGAINST CDG AND DOES 1-100)

30.    Plaintiff re-alleges and incorporates herein by this reference, as though fully set forth herein, the allegations of paragraphs 1 through 29.

31.    Defendant, CDG, as an employer failed to take reasonable steps to prevent discrimination from occurring which is in violation of Government Code section 12940(k).

32.    As a direct and proximate result of the defendants' and each of their actions alleged herein, OLIVARES has suffered and continues to suffer physical and emotional distress, financial hardship, wage losses, humiliation, mental anguish, mental and physical pain, and other damages in an amount to be proven at trial, but in no event less than $100,000.00 dollars.

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 6

33.    As a further direct and proximate result of defendants' and each of their actions alleged herein, OLIVARES has and continues to incur legal fees, costs, and other expenses in the prosecution of this matter.

34.    The above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff of her rights under the law and, therefore, entitle the Plaintiff to an award of punitive and exemplary damages.

**FOURTH CAUSE OF ACTION**

**(RETALIATION (GOV'T CODE §12940(h))**

**(AGAINST CDG AND DOES 1-100)**

35.    Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 34.

36.    As the result of Plaintiff's complaints regarding her perceived acts of discrimination on the part of DASON, and due to her refusal to participate in a sexual relationship with DASON, Defendant CDG retaliated against Plaintiff in violation of Government Code section 12940(h) by failing to give her raises, and by making her workplace unbearable following Plaintiff's refusal to do what DASON demanded.

37.    As a direct and proximate result of the Defendants' and each of their actions alleged herein, OLIVARES has suffered and continues to suffer extreme physical and emotional distress, financial hardship, wage losses, humiliation, mental anguish, mental and physical pain, and other damages in an amount to be proven at trial, but in no event less than $100,000.00 dollars.

38.    As a further direct and proximate result of defendants' and each of their actions alleged herein, OLIVARES has and continues to incur legal fees, costs, and other expenses in the prosecution of this matter.

39.    The above referenced acts of defendants were done intentionally with malice and to deprive Plaintiff of her rights under the law and, therefore, entitle the Plaintiff to an award of punitive and exemplary damages.

///

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 7

## FIFTH CAUSE OF ACTION

### FAILURE TO PAY WAGES IN A TIMELY MANNER

### (AGAINST CDG, AND DOES 1-100)

40.     Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 39.

41.     Pursuant to Labor Code § 218 and 218.5, plaintiff may bring a civil action for unpaid wages directly against the employer in plaintiffs name without first filing a claim with the Department of Labor Standards Enforcement.

42.     Pursuant to Labor Code § 201, when defendant fails to pay wages due within three days of constructive termination, defendant is obligated to pay all wages plus penalties in the amount of one day's wages for each day said wages are not paid, up to a maximum of thirty days.  In addition, Plaintiff is entitled to recover attorney's fees, other penalties, interest, and costs incurred in filing a lawsuit to collect said wages.

43.     On the day of Plaintiff's constructive termination of her employment, Plaintiff was not offered her paycheck in the time required to be paid pursuant to law and has not yet received all remuneration due to her. Defendant has failed and refused, and continues to fail and refuse, to pay PLAINTIFF amounts that are owed. Defendants' failure to pay PLAINTIFF wages accrued violates the provision of Labor Code § 201 and, therefore, subjects defendants to penalty wages.

44.     PLAINTIFF requests payment of wages due according to proof, penalty wages, interest, attorney's fees and costs pursuant to Labor Code § 201, and 218.5, as well as the assessment of any other statutory penalties against defendants in a sum as provided by the Labor Code and/or other applicable statutes.

45.     In addition to the above, PLAINTIFF has and continues to incur legal fees, costs, and other expenses in the prosecution of this matter.

///

///

///

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SIXTH CAUSE OF ACTION

## FAILURE TO PAY OVERTIME PAY

## (AGAINST CDG AND DOES 1-100)

46.    Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 45.

47.    PLAINTIFF is informed and believes and thereon alleges that during the period that she was employed by defendants, PLAINTIFF regularly and routinely worked in excess of 8 hours in a given work day.  As the result thereof, pursuant to California Labor Code sections 510 et. seq., and Industrial Welfare Commission Order 4-2001, PLAINTIFF was entitled to receive overtime pay for each of the hours worked in excess of 8 hours per day.  Plaintiff is also entitled to recover waiting time penalties pursuant to California Labor Code section 203, interest pursuant to California Labor Code section 1194, and attorney's fees pursuant to California Labor Code section 1194.3.

## SEVENTH CAUSE OF ACTION

## FAILURE TO PROVIDE REST BREAKS

## (AGAINST CDG AND DOES 1-100)

48.    Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 47.

49.    PLAINTIFF is informed and believes and thereon alleges that during the period that she was employed by defendants, PLAINTIFF worked each day for 8 hours or more without being provided rest breaks.  As the result thereof, pursuant to California Labor Code sections 226.7 et. seq., and Industrial Welfare Commission Order 4-2001, PLAINTIFF is entitled to payment for the hours in which she worked without receiving rest breaks required to be provided during the course of the work day.  PLAINTIFF is also entitled to recover waiting time penalties pursuant to California Labor Code section 203, interest pursuant to California Labor Code section 218.6, and attorney's fees pursuant to California Labor Code section 218.5.

///

///

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 9

Exhibit "1" Page 9 of 19

## EIGHTH CAUSE OF ACTION

## UNFAIR COMPETITION

## (AGAINST CDG AND DOES 1-100)

50.    Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 49.

51.    Defendants' acts constitute a continuing and ongoing unlawful activity prohibited by the Unfair Competition Laws set forth in Bus. & Prof. Code § 17200 et. seq.

52.    Labor Code § 90.5(a) articulates the public policy of this State to vigorously enforce minimum labor standards, including the requirements of providing rest and meal breaks and other employment benefits pursuant to Labor Code § 1198. Labor Code §6300 et. seq. (The California Occupational Safety Health Act of 1973) was enacted to ensure safe and helpful working conditions in the State of California. Defendants' conduct of failing to allow for meal breaks and rest breaks are required by the State and Federal Laws and regulation constitutes were intended to constitute unfair competition and unlawful and unfair acts and practices within the meaning of the Unfair Competition Laws.

53.    Through the wrongful and illegal conduct alleged herein, Defendants have acted contrary to the public policy of this State.

54.    As a result of Defendants' violations of the Unfair Competition Law, it has unjustly enriched itself at the expense of PLAINTIFF, and the general public.

55.    To prevent this unjust enrichment, Defendants should be required to disgorge their illegal gains and should be required to make restitution to PLAINTIFF.

56.    PLAINTIFF also requests that this Court enter such orders or judgment as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair practices, as provided in the UCL, Bus. & Prof. Code § 17203, and for such other relief as set forth below.

57.    PLAINTIFF is a "person" within the meaning of Bus. & Prof. Code § 17204 and has standing to bring this claim for injunctive and equitable relief because she has suffered direct financial injury.

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 10

58.     Injunctive relief is necessary to prevent Defendants from continuing to engage in unfair business practices, as alleged herein. Defendants, and persons acting in concert with it, has done, or is now doing, and will continue to do or cause to be done, the above-described illegal acts unless restrained or enjoined by this Court.

59.     The conduct of Defendants, as alleged herein, have been and continues to be deleterious to PLAINTIFF and the general public. By this action, PLAINTIFF seeks to enforce important rights affecting the public interest within the meaning of Code Civ. Proc. § 1021.5.

60.     Pursuant to Bus. & Prof. Code § 17203, PLAINTIFF, on behalf of herself and all other employees similarly situated requests injunctive relief, restitution and/or disgorgement of all sums obtained by Defendants in violation of Bus. & Prof. Code § 17200 et seq.

### NINTH CAUSE OF ACTION

### PENALTIES PURSUANT TO LABOR CODE § 2699

### (AGAINST CDG AND DOES 1-100)

61.     Plaintiff re-alleges and incorporates herein by this reference as though fully set forth herein the allegations of paragraphs 1 through 60.

62.     As a result of the acts alleged above, Plaintiff seeks penalties under Labor Code § 2699, et seq. because of Defendant's violation of Labor Code §§ 201, 203, 226, 226.7, & 510, which call for civil penalties, which allow for private action under the Private Attorney's General Act (PAGA).

63.     For each such penalty, Plaintiff is entitled to penalties in an amount to be shown at trial, subject to the following formula:

(a)     $100 for the initial violation per pay period.

(b)     $200 for each subsequent violation per pay period.

64.     These penalties shall be allocated seventy-five percent (75%) to the Labor and Workforce Development Agency (LWDA) and twenty-five percent (25%) to the affected employee.

65.     Plaintiff sent a certified letter to the LWDA and Defendant as proscribed by the Code on January 23, 2013. As no letter evidencing the LWDA's intention to investigate was

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 11

received within thirty-three (33) calendar days, Plaintiff is entitled to commence a civil action as though the LWDA had not chosen to investigate pursuant to Labor Code § 2699.3(a)(2)(A).

   **WHEREAS**, Plaintiff prays for judgment on the above causes of action as follows:

AS TO THE FIRST CAUSE OF ACTION:

   1.   For general and special damages in an amount to be proven at trial, but in no event less than $100,000.00 dollars;

   2.   For punitive and exemplary damages in an amount to be proven at trial.

   3.   For attorneys fees pursuant to statute;

   4.   For costs of suit;

   5.   For prejudgment interest;

   6.   For such other relief as the court deems appropriate.

AS TO THE SECOND CAUSE OF ACTION:

   1.   For general and special damages in an amount to be proven at trial, but in no event less than $100,000.00 dollars;

   2.   For punitive and exemplary damages in an amount to be proven at trial.

   3.   For attorneys fees pursuant to statute;

   4.   For costs of suit;

   5.   For prejudgment interest;

   6.   For such other relief as the court deems appropriate.

AS TO THE THIRD CAUSE OF ACTION:

   1.   For general and special damages in an amount to be proven at trial, but in no event less than $100,000.00 dollars;

   2.   For punitive and exemplary damages in an amount to be proven at trial.

   3.   For attorneys fees pursuant to statute;

   4.   For costs of suit;

   5.   For prejudgment interest;

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 12

6.      For such other relief as the court deems appropriate.

AS TO THE FOURTH CAUSE OF ACTION:

1.      For general and special damages in an amount to be proven at trial, but in no event less than $100,000.00 dollars;

2.      For punitive and exemplary damages in an amount to be proven at trial.

3.      For attorneys fees pursuant to statute;

4.      For costs of suit;

5.      For prejudgment interest;

6.      For such other relief as the court deems appropriate.

AS TO THE FIFTH CAUSE OF ACTION:

1.      For wages due and owing, including penalty wages in an amount to be proven at trial;

2.      For other penalties authorized under the California Labor Code according to proof;

3.      For costs of suit, including reasonable attorney's fees;

4.      For prejudgment interest;

5.      For such other relief as the court deems appropriate.

AS TO THE SIXTH AND SEVENTH CAUSES OF ACTION:

1.      For wages due and owing, including penalty wages in an amount to be proven at trial;

2.      For other penalties authorized under the California Labor Code according to proof;

3.      For costs of suit, including reasonable attorney's fees;

4.      For prejudgment interest;

5.      For such other relief as the court deems appropriate.

AS TO THE EIGHTH CAUSE OF ACTION:

1.      For such relief as is necessary to restore to Plaintiff the money and property which defendants have acquired, or of which Plaintiff has been deprived by means of the herein described unfair and/or unlawful business practices;

2.      For a declaration that the above described business practices are unfair and unlawful, and injunctive relief restraining defendants from engaging in any of the herein described unfair and/or unlawful business practices at all times in the future;

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 13

1       3.     For reasonable attorneys' fees and the costs of bringing this suit, pursuant to Code

2   Civ. Proc. §1021.5.

3       4.     For such other relief as the court deems proper.

4   AS TO THE NINTH CAUSE OF ACTION:

6       1.     Penalties and relief pursuant to Labor Code § 2699;

7       2.     For attorneys fees pursuant to statute;

8       3.     For costs of suit;

9       4.     For such other relief as the court deems proper.

11   DATED: April 9, 2013           DESJARDINS & PANITZ, LLP

13              By:

14                   Eric A. Panitz
                Attorneys for Plaintiff

15                   JUDDY OLIVARES

20   **DEMAND FOR JURY TRIAL**

21       Plaintiff hereby demands the trial in this matter be tried before a jury.

23   DATED: April 9, 2013           DESJARDINS & PANITZ, LLP

25              By:

26                   Eric A. Panitz
                Attorney for Plaintiff

27                   JUDDY OLIVARES

28

        VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 14

## VERIFICATION

I, JUDDY OLIVARES, am the Plaintiff in the above-entitled action. I have read the foregoing Verified First Amended Complaint and know the contents of this Verified First Amended Complaint. The same is true of my own knowledge, except as to those matters that are therein alleged on information and belief, and as to those matters, I believe it to be true. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on ~~March~~ April 3 , 2013 in San Bernardino, California.

By: _____    Dated: 4-3-13 _____
    JUDDY OLIVARES

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 15

Exhibit "1" Page 15 of 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"
### ("Right to Sue Letter")

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES - 16



STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                    GOVERNOR EDMUND G. BROWN JR.

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING                    DIRECTOR PHYLLIS W. CHENG

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 | Videophone (916) 226-5285 | TDD (800) 700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

Jan 22, 2013

Juddy Olivares

1025 N. Tippecanoe Ave. #105

San Bernardino, CA 92410


RE: 80503-36985  - Olivares Juddy - Right To Sue

### Notice of Case Closure and Right to Sue

Dear Juddy Olivares:

This letter informs you that the above-referenced complaint that was filed with the
Department of Fair Employment and Housing (DFEH) has been closed effective Jan 22,
2013 because an immediate Right to Sue notice was requested. DFEH will take no
further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment
Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this
DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act,
whichever is earlier.

DFEH does not retain case files beyond three years after a complaint is filed, unless the
case is still open at the end of the three-year period.

Sincerely,


Department of Fair Employment and Housing


cc: Cesar Espinoza, Agent for Service for SAM DANIEL DASON, DDS, A PROFESSIONAL
CORPORATION

SAM DASON

**CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING**
EMPLOYMENT

COMPLAINT OF DISCRIMINATION UNDER THE PROVISIONS OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

DFEH INQUIRY NUMBER:
80503-36985

COMPLAINANT NAME:
Juddy Olivares

NAMED IS THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, OR STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

| RESPONDENT NAME: SAM DANIEL DASON, DDS, A PROFESSIONAL CORPORATION | AGENT FOR SERVICE NAME: Cesar Espinoza | TELEPHONE NUMBER: (909) 825-0545 |
|---|---|---|
| ADDRESS (AGENT FOR SERVICE): 251 E. Valley Blvd. | | CITY/STATE/ZIP: Colton, CA 92324 |
| NO. OF EMPLOYEES/MEMBERS: 50 | DATE MOST RECENT DISCRIMINATION TOOK PLACE: Jan 17, 2013 | TYPE OF EMPLOYER: Private Employer |

CO-RESPONDENT(S):

| NAME | ADDRESS |
|---|---|
| SAM DASON | 575 West 5th Street  San Bernardino  CA 92410 |

I wish to pursue this matter in court. I hereby request that the Department of Fair Employment and Housing provide a right to sue. I understand that if I want a federal right to sue notice, I must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of the DFEH "Notice of Case Closure and Right to Sue," or within 300 days of the alleged discriminatory act, whichever is earlier.

I have not been coerced into making this request, nor do I make it based on fear of retaliation if I do not do so. I understand it is the Department of Fair Employment and Housing's policy to not process or reopen a complaint once the complaint has been closed on the basis of "Complainant Elected Court Action."

By submitting this complaint, I am declaring under penalty of perjury under the laws of the State of California that, to the best of my knowledge, all information contained in this complaint is true and correct, except matters stated on my information and belief, and I declare that those matters I believe to be true.

DATED January 22, 2013 At San Bernardino    VERIFIED BY: Juddy Olivares

DFEH-300-030 (07/12)
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

DATE FILED: Jan 22, 2013
MODIFIED: Jan 22, 2013

STATE OF CALIFORNIA

Page 1/2

Exhibit "1" Page 18 of 19



CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
EMPLOYMENT

COMPLAINT OF DISCRIMINATION UNDER THE PROVISIONS OF THE CALIFORNIA FAIR EMPLOYMENT AND
HOUSING ACT

I ALLEGE THAT I EXPERIENCED:
Discrimination, Harassment, Retaliation

ON OR BEFORE: Jan 17, 2013

BECAUSE OF MY     Sex- Gender
ACTUAL OR
PERCEIVED:

AS A RESULT, I WAS:         Asked impermissible non-job-related questions, Denied a work environment free of
                           discrimination and/or retaliation, Forced to quit

STATE WHAT YOU BELIEVE TO BE THE REASON(S) FOR DISCRIMINATION:

Since October of 2010, OLIVARES was working for SAM DANIEL DASON, DDS, A PROFESSIONAL DENTAL CORPORATION which
does business as Colton Dental Group [hereinafter "CDG"] as a dental assistant and back office manager at its Colton, California facility.
OLIVARES is paid $11.00 per hour. Throughout OLIVARES's employment, OLIVARES was subjected to offensive sexual comments and
inquiries, and other unwelcome sexually based, offensive conduct by SAM DASON, DDS [hereinafter "DASON"] who owns CDG.
Specifically, the owner, DASON, would periodically make sexual jokes, sexual comments, leer at her, and inquire about private sexual
topics. Each time DASON said something inappropriate, OLIVARES told her manager, Cesar Espinoza, but he repeatedly failed to take
sufficient action to prevent DASON from continuing to make inappropriate sexual comments and jokes. Thereafter, beginning on or about
April 2012, OLIVARES was subjected to repeated unwelcome sexual touching at the hands of DASON. Specifically, in April 2012, as
OLIVARES was developing an x-ray during a root canal, DASON grabbed OLIVARES's buttocks. After root canal, DASON apologized,
and promised not to do it again, and OLIVARES reported the incident to her manager, Espinoza. Several months later, in June or July
2012, as OLIVARES attempted to turn off an air conditioner at the end of the day, DASON grabbed OLIVARES's buttocks and laughed.
In response, OLIVARES again went to her manager, Espinoza, and related what had happened. Espinoza told OLIVARES to talk to
DASON but she refused. Then, in November 2012, as OLIVARES reached for gloves, DASON again grabbed OLIVARES's buttocks.
One week later, as OLIVARES was leaving the office, DASON grabbed OLIVARES's right breast and he then walked out the door. On
December 7, 2012, OLIVARES confronted DASON about touching her breast and buttocks. In response, DASON stated that because
OLIVARES has an attractive smile, he slips, and it is hard for him to stay away. DASON apologized and once again promised to try not to
behave in an inappropriate manner. Then on January 9, 2013, as OLIVARES requested a $3.00 per hour raise, DASON stated that
OLIVARES's raise would be dependent upon her agreeing to go to Las Vegas with him. At that time, DASON told OLIVARES that his
wife was going to India in six months regarding something to do with her mother. OLIVARES was speechless, and did not respond.
Espinoza knew that OLIVARES intended to ask DASON for a raise, and after they were apart, Espinoza asked OLIVARES what had
happened. OLIVARES informed Espinoza what DASON had said, and Espinoza advised OLIVARES to agree to go to Vegas, accept the
raise, and then later refuse to go because of OLIVARES's daughter. OLIVARES did not follow Espinoza's advice. Finally, on January
16, 2013, OLIVARES again requested a raise, and DASON insisted on discussing her raise outside the office over lunch. OLIVARES
responded that she did not feel comfortable going out to lunch with DASON, and could they just discuss her raise in the office. DASON
replied that he did not have to give her a raise, and that OLIVARES's raise would be postponed until she agreed to go out to lunch with
him. In response, OLIVARES told DASON that she would not go out to lunch with him. DASON then told OLIVARES that he was trying to
get on a personal level with her, and OLIVARES was not letting that happen. DASON also said that lunch was now off the table, and that
he would make it very difficult for OLIVARES to continue to work there. The following day, on January 17, 2013, DASON made
OLIVARES's work day intolerable by repeatedly questioning her every action and severely criticizing her work. OLIVARES complained to
Espinoza, but he failed to take any action to stop DASON. At that point OLIVARES felt that she had no choice but to leave because she
could not continue to work under those conditions. OLIVARES left work early at about 3:00 p.m. and has not returned to work. The
activities of the CDG and DASON as referenced herein-above, created a hostile, intimidating, and offensive working environment. In
retaliation for her failure to engage in the sexual banter with DASON and in retaliation for her complaints, and in retaliation for her refusal
to engage in a sexual relationship with DASON, OLIVARES was constructively terminated on January 17, 2013.

DFEH-300-030 (07/12)                          DATE FILED: Jan 22, 2013        STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING     MODIFIED: Jan 22, 2013

                                                                             Page 2/2

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    FOR THE COUNTY OF SAN BERNARDINO

3    --o0o--

4    JUDDY OLIVARES,                    )
                                        )
5                      Plaintiff,       )
                                        )
6            -vs-                       )    CASE NO.  CIVDS1300810
                                        )
7    SAM DASON,                         )
                                        )
8                      Defendant.       )
     _____)

9

10    REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

11    BEFORE HON. JOHN M. PACHECO, JUDGE
              DEPARTMENT S-31
12    SAN BERNARDINO, CALIFORNIA
      THURSDAY, FEBRUARY 25, 2016

13

14

15    APPEARANCES:
      FOR THE PLAINTIFF:              MCNICHOLAS & MCNICHOLAS LLP
16                                    PATRICK MCNICHOLAS
                                      ATTORNEY AT LAW
17                                    10866 WILSHIRE BOULEVARD
                                      SUITE 1400
18                                    LOS ANGELES, CA  90024

19
                                      DESJARDINS AND PANITZ LLP
20                                    ERIC PANITZ
                                      ATTORNEY AT LAW
21                                    18000 STUDEBAKER ROAD
                                      SUITE 700
22                                    CERRITOS, CA 90703

23
      FOR THE DEFENDANT:              NOT PRESENT
24

25    REPORTED BY:                    KERRI DAVERSA, CSR,
                                      PRO TEMPORE REPORTER
26                                    CSR. NO. 13882

1

1      SAN BERNARDINO, CALIFORNIA; THURSDAY, FEBRUARY 25, 2016

2                       AFTERNOON SESSION

3  DEPARTMENT NO. S-31            HON. JOHN M. PACHECO, JUDGE

4  APPEARANCES:

5              (PATRICK MCNICHOLAS, Attorney at Law,

6              and ERIC PANITZ, Attorney at Law,

7              representing the Plaintiff; Defendant

8              and his counsel, not present.)

9              (Kerri Daversa, Pro Tempore Reporter,

10             CSR No. 13882.)

11                      --o0o--

12       THE COURT:  All right.  I'd like to call the case of

13  Olivares versus Dason, et al.

14       Good afternoon, appearances for the record, please.

15       MR. MCNICHOLAS:  Good afternoon, your Honor.

16  Patrick McNicholas for the plaintiff.

17       MR. PANITZ:  Good afternoon, your Honor.  Eric Panitz

18  for the plaintiff.

19       THE COURT:  Is Ms. Olivares present?

20       MR. MCNICHOLAS:  Yes, your Honor.

21       THE COURT:  Ms. Olivares, why don't you come forward?

22       THE WITNESS:  Good afternoon.

23       THE COURT:  Are you nervous?

24       THE WITNESS:  Yes.

25       THE COURT:  Don't be nervous.  You have two very fine

26  lawyers here.

1  Could you raise your right hand to be sworn in?

2  THE JUDICIAL ASSISTANT:  Do you solemnly state that the

3  evidence you shall give in this matter will be the truth, the

4  whole truth, and nothing but the truth, so help you God?

5  THE WITNESS:  Yes.

6  THE JUDICIAL ASSISTANT:  Thank you.

7  THE COURT:  And Mr. Panitz, do you have anyone else here?

8  MR. PANITZ:  Yes, your Honor.  We have Dr. Kania.

9  THE COURT:  Dr. Kania, how are you?  I haven't seen you

10  in a while.

11  WITNESS MICHAEL KANIA:  Yeah, I think it was September or

12  October, sometime like that, yeah.

13  THE COURT:  Is Dr. Kania going to testify?

14  MR. PANITZ:  Yes, your Honor.

15  THE COURT:  All right.  So this matter is set for trial.

16  As I understand, the procedures that -- or actually the orders of

17  the Court are that you would be placed on 24-hour notice and that

18  I had asked counsel for the plaintiff to please give notice, and

19  then there was a dispute as to whether or not -- who was the

20  attorneys of record for the defendants.

21  We received a subsequent call after you answered ready,

22  Mr. Panitz, and it was a very irate Mr. Garibay who was under the

23  mistaken belief, according to him and you can clarify this, that

24  he believed that the doctor and defendants had a new attorney,

25  and he was pretty upset about the whole thing.

26  And it was clarified by my judicial assistant to

1   Mr. Garibay that Mr. Rasmussen had filed a substitution of

2   attorney, but that substitution of attorney was only limited to

3   Sam Dason, and that substitution had been filed on January 4th.

4          As I understand the case, Sam Dason is an individual, and

5   there's also a Sam Daniel Dason, DDS, a Professional Dental

6   Corporation and a DDA of Colton Dental Group; is that correct?

7          MR. PANITZ:  Yes, your Honor.

8          THE COURT:  So with that clarification, Mr. Garibay did

9   hang up the phone or slam the phone down.

10         As of right now, the Court has not received any further

11  substitutions, nor has the courthouse received any proof of

12  further substitution; is that correct?

13         THE JUDICIAL ASSISTANT:  That's correct, your Honor.

14         THE COURT:  So we did send an e-mail to Mr. Garibay, to

15  Mr. Panitz, and I don't know if it was sent to Mr. McNicholas or

16  not in this case, and again, it was also sent to Mr. Rasmussen,

17  but apparently the e-mail did come back.

18         But nonetheless, as I understand, Mr. Panitz had spoken

19  to Mr. Rasmussen and told him that we're supposed to start trial

20  today; is that correct?

21         MR. PANITZ:  Is that correct?

22         THE COURT:  At 10:00 o'clock.

23         MR. PANITZ:  At 9:00 o'clock.

24         THE COURT:  9:00 o'clock.

25         And as an officer of the court, what can you tell me his

26  response was?

4

1      MR. PANITZ:  That he did not to intend appear, that he

2  claimed that his client would, in the future, be filing

3  bankruptcy, and that I clarified with him that there was no

4  bankruptcy stay in place as of the time of my call with him then,

5  and he acknowledged that that was in fact true.

6      THE COURT:  So very disturbing to the Court.

7      The Court was handed this morning an e-mail sent to

8  Ms. Serrano, my judicial assistant, Wednesday, February 24th, at

9  9:38 p.m., and as I understand it, Mr. Panitz, you did not

10  receive a similar e-mail?

11      There was no CC or anything like that?

12      MR. PANITZ:  That's correct, your Honor.

13      THE COURT:  So the Court considers this to be an ex parte

14  communication in violation of professionals rules of state bar,

15  and the e-mail states, "Please take notice that Defendant Sam

16  Dason" -- doesn't say anything about the medical group or the

17  professional dental group or anything like that.

18      It says, "Please take notice that Defendant Sam Dason has

19  chosen not to defend this lawsuit and will not appear for the

20  trial.  He will be filing for Chapter 7 bankruptcy on

21  February 26th, 2016," which by my looking at the calendar, that's

22  tomorrow.  "And a copy of the automatic stay will be e-mailed to

23  you when available."

24      Also he says, "I will also not be appearing as I am on a

25  family emergency trip to Phoenix, Arizona."

26      Mr. Panitz, did Mr. Rasmussen tell you that he was out of

1  town when you spoke with him?

2        MR. PANITZ:  He did not mention that at all.

3        THE COURT:  Did he say that he was not going to appear?

4        MR. PANITZ:  He did say that he did not intend to appear.

5        THE COURT:  So Mr. Panitz, can you produce for me the

6  notice that was sent to both counsel Mr. Garibay, who represents

7  Samuel Daniel Dason, DDS, a Professional Dental Corporation doing

8  business as Colton Dental Group, and attorney Mr. Rasmussen who

9  represents Sam Dason, an individual.

10        MR. PANITZ:  I can.

11        A copy was filed with the Court on December 28th, your

12  Honor, but I believe it's right here.

13        THE COURT:  Well, let me just see.

14        Oh, here it is, and that was filed with the Court, and it

15  says "Notice of Jury Trial."

16        Correct?

17        MR. PANITZ:  There's a separate pleading that was also

18  filed on the 28th that says --

19        THE COURT:  "Notice of Ruling, Ready Trial Date, and

20  Trial Subpoenas and Defendant's Oral Motion for Reconsideration."

21        MR. PANITZ:  Well, yes, that's the one with regard to the

22  trailing.

23        THE COURT:  Okay.

24        MR. PANITZ:  Sorry.  That's with regard to this trial

25  date on February 16th and then subsequent to that, there was

26  another notice filed with the Court that relates to that.

1    On February 11th, when, at the trial readiness conference

2    nobody appeared, I sent notice of your ruling that we were

3    trailing on 24-hours' notice and filed that with the Court.  I

4    have a service.

5    THE COURT:  And what's the date of that?

6    When was that received?

7    MR. PANITZ:  I have a service date of February 15th.

8    THE COURT:  Okay.  I don't have that.

9    Do you have a copy of that?

10    THE JUDICIAL ASSISTANT:  Is that from the February 11th

11   hearing?

12    MR. PANITZ:  Yes.  That's a copy, but I don't think I

13   have a conformed copy with me, and I also filed a notice of jury

14   trial.  But that was back in December.

15    THE COURT:  Oh, okay.  I'm going to have to stop

16   everything because we have a verdict.  Sorry.

17    (Whereupon, proceedings of an unrelated

18    matter were heard and reported, but not

19    transcribed for purposes of this transcript.)

20    THE COURT:  We are back on the Olivares versus Sam Dason

21   and Sam Daniel Dason DDS, a Professional Dental Corporation doing

22   business as Colton Dental Group.

23    The Court's been handed a notice of ruling regarding

24   trial and order to show cause regarding sanctions and terminating

25   sanctions.

26    The Court reviewed it.  It's signed February 12th by

1    Mr. Eric Panitz, and it was filed with the Court on the 16th of

2    February.    Proof of service shows was sent to Mr. Javier Garibay

3    and also Dennis Rasmussen.

4         And as far as we know, those are their current addresses;

5    is that correct?

6         MR. PANITZ:    That is correct.

7         THE COURT:    The Court makes the following finding; that

8    there has been adequate notice given to the defendants and their

9    refusal to be here today, pursuant to the notice of ruling, will

10   result in the striking of their Answer.

11        The Court at this time will exercise its discretion and

12   find a cause to strike the Answer due to their failure to be

13   here.

14        I do not find that an ex parte communication was

15   appropriate, nor was it adequate at this point in time for the

16   Court to stop proceeding with this case as ordered by the Court.

17        So at this point in time, I have reviewed your trial

18   brief.    Did you get a copy of your trial brief?

19        Did you get to read that?

20        WITNESS JUDDY OLIVARES:    Yes.

21        THE COURT:    And there was a lot of facts in that trial

22   brief which the Court did review.

23        I guess the question I would say to you, Ms. Olivares,

24   are all those facts that are set forth in this trial brief, are

25   they all true and correct?

26        WITNESS JUDDY OLIVARES:    Yes.

1    THE COURT:  And if you were asked to testify to these

2    incidents that occurred, would you substantiate them and say

3    everything that your lawyer put in this brief is true and

4    correct?

5    WITNESS JUDDY OLIVARES:  Yes.

6    THE COURT:  That certainly will expedite this matter.

7    And at this time, Mr. McNicholas, and/or Mr. Panitz,

8    would you like to do an offer of proof and that way we can move

9    on with this case?

10    MR. MCNICHOLAS:  Yes, your Honor.  Thank you very much

11    for indulging us and moving this along in an expeditious fashion.

12    I've only been here twice, but as I've witnessed in this

13    courtroom and as explained to me by Mr. Panitz, the Court has

14    exercised extraordinary patience with respect to the defense, as

15    well as extraordinary judicial demeanor.  So that is noted, and

16    we want to thank the Court.

17    With the Court's indulgence, what we'd like to do -- at

18    this time, we just have two witnesses, which would be pretty

19    brief.  That would be Ms. Olivares and Dr. Kania just to walk the

20    Court through the timeline of events as they occurred from

21    employment and then Dr. Kania can explain from the medical

22    perspective how that is affecting her now into the future.

23    We have identified ten exhibits which we've pulled from

24    the exhibit books -- we don't need the exhibit binders now --

25    which we can mark in order, if necessary, as we move through the

26    process.

1    Additionally, we have requested the Court take judicial

2    notice of the first amended verified Complaint as it contains the

3    DFEH Right-to-Sue letter, just so the record is complete.

4        THE COURT:  So ordered.

5        MR. MCNICHOLAS:  And also, just this brief outline in

6    this case at this point in time with respect to the damages,

7    there is a quid pro quo cause of action for sexual harassment.

8    There is a hostile work environment claim for sexual harassment,

9    and there is a punitive damage claim in this case also.

10        So with respect to the quid pro quo, we'll present

11   evidence of that.  With respect to the hostile work environment,

12   we'll also present evidence as to that, and then I think Dr.

13   Kania can address her current medical state, as he has diagnosed

14   her in that regard.

15        Does the Court have any questions at this point in time

16   or preferences?

17        THE COURT:  Yeah.  I was just a little -- not perplexed,

18   but I just had a question in my mind with respect to the punitive

19   damages.

20        Normally punitive damages requires some proof of wealth

21   or lack thereof, and so I don't know what type of testimony or

22   what kind of evidence you would have in that regard with respect

23   to the punitive damages?

24        MR. MCNICHOLAS:  None.

25        We did discuss that and to address that issue without

26   having briefed it -- we were going to make a ten percent of

1  whatever the compensatory damages is which is fairly light given

2  the usual standard, and what we're requesting is to get all the

3  evidence in today.

4       If the Court finds it's inappropriate, then don't award

5  the punitive damages, or the Court can include the punitive

6  damages.  And then if we don't have appropriate authority, could

7  strike them at a later date.

8       THE COURT:  Okay.

9       MR. MCNICHOLAS:  But our main goal is to get judgment

10 entered today.  So if that would preclude us from doing that,

11 we'd rather not do that.

12      THE COURT:  In the interest of justice, it's important

13 for us to go forward, so, Ms. Olivares, you can go on with your

14 life.  This case has dragged on an exceptionally long period of

15 time.

16      I have to try to be fair to both sides, but it has been

17 difficult with the other side.  It just seems to me that there

18 was a pattern of delay, and it was depriving you of your right to

19 your day in court.

20      So with that being said, I do feel that there's been

21 adequate notice to the parties, to the attorneys, and that we

22 were going to go forward, and we are going forward today.

23      WITNESS JUDDY OLIVARES:  Thank you.

24      THE COURT:  Sure.  All right.

25      So are you ready?

26      MR. MCNICHOLAS:  Yes.  We'd like to call Ms. Olivares to

1  the witness stand.

2          THE COURT:  Sure.  Why don't you come up, Ms. Olivares.

3          State your full name and spell your last name

4  for the record.

5          WITNESS JUDDY OLIVARES:  Juddy Olivares, O-l-i-v-a-r-e-s.

6          THE COURT:  All right.

7          Proceed.

8          MR. MCNICHOLAS:  Thank you, your Honor.  And for ease of

9  reference, we've created a timeline, and we've handed it to

10  Ms. Serrano.

11          I also have a copy in front of Ms. Olivares, and we'll

12  just work through the timeline.  And this will be our outline

13  for the testimony.  It should make it easier to go through.

14          THE COURT:  Okay.

15

16                          JUDDY OLIVARES,

17  called as a witness by and on behalf of the Plaintiff, having

18  been first duly sworn, was examined and testified as follows:

19

20

21                        DIRECT EXAMINATION

22  BY MR. MCNICHOLAS:

23    Q  Ms. Olivares, can you tell us how old you are?

24    A  I'm 28.

25    Q  Do you have any children?

26    A  Yes.

1   Q   How many?

2   A   One.

3   Q   How old is your child?

4   A   Eight.

5   Q   What's her name?

6   A   Layla Chavez.

7   Q   And did you graduate from high school?

8   A   Yes.

9   Q   When did you graduate from high school?

10  A   June 2006.

11  Q   And where are you currently living?

12  A   Duarte.

13  Q   And at some point in time, did you become employed with

14  Dr. Dason?

15  A   Yes.

16  Q   Do you remember when that occurred?

17  A   October 2010.

18  Q   And do you remember when you were terminated from your

19  employment with Dr. Dason?

20  A   January 17, 2013.

21  Q   All right.  And when you began your employment, what was

22  your job title?

23  A   Dental assistant.

24  Q   And what were your job duties and responsibilities?

25  A   I worked the front desk, made appointments, pulled charts,

26  checked insurances, made charts for patients.

Exhibit "2" Page 13 of 68

1   Q   Now, during the period of time when you were employed by

2   Dr. Dason, did you come into contact with him?

3   A   Yes.

4   Q   Okay.   So for during the first month or two of your

5   employment, how often did you come into contact with him?

6   A   About four times -- I'm sorry.

7       I would see him about eight times a month.

8   Q   So did he work all the time in the office with you?

9   A   No.

10   Q   So he had another office?

11   A   Yes.

12   Q   And so you would see him when he came into the office?

13   A   Yes.

14   Q   So during the period of time when you first began working,

15   did he, at some point in time, ask you to go to a Laker game?

16   A   Yes.

17   Q   When did that occur?

18   A   Sometime in March 2011.

19   Q   And do you have a recollection of the circumstances of which

20   he asked you to the Laker game?

21   A   He just kept asking me throughout the day if I can go to the

22   game with him.

23   Q   Did you want to go?

24   A   No.

25   Q   Did you go?

26   A   Yes.

1    Q  Why did you go?

2    A  I just felt pressured.

3    Q  And how did you get to the Laker game?

4    A  He drove.

5    Q  How did you get back?

6    A  He drove me back and dropped me off at my car.

7    Q  Was there anything that you viewed as inappropriate at the

8    game?

9    A  No.

10    Q  Or in the car ride?

11    A  No.

12    Q  And at some time after that, did you come to know that

13    Dr. Dason created a Facebook page?

14    A  Yes.

15    Q  And how did you come to understand that?

16    A  He sent me a friend request on Facebook.

17    Q  Did you have a Facebook page at that time?

18    A  Yes, I did.

19    Q  What was your Facebook name?

20    A  Phoenix Ponce.

21    Q  That was your Facebook name?

22    A  Correct.

23    Q  It was not your real name?

24    A  Correct.

25    Q  And when you received the friend request, who was it from?

26    A  The name was Phoenix Phan.

1    Q   And did you come to find out who that was from?

2    A   Yes.

3    Q   Who was that from?

4    A   Dr. Dason.

5    Q   How do you know that?

6    A   He sent me a message.

7    Q   By way of Facebook?

8    A   Yes.

9    Q   Did you respond?

10   A   No.

11   Q   Did you receive other Facebook messages from Dr. Dason?

12   A   No.

13   Q   Was that the only one?

14   A   Yes.

15   Q   At some point in time after the Laker game, after the

16   Facebook, were you asked to go to a dental convention?

17   A   Yes.

18   Q   Who asked you to go to the dental convention?

19   A   Dr. Dason.

20   Q   When did that occur?

21   A   In May 2011.

22   Q   All right.  If you need to, you can refer to the timeline,

23   just let us know if you're referring to the timeline or if you're

24   doing that from your recollection.  Fair enough?

25   A   Yes.

26            THE COURT:  And if you refer to the timeline, if that

1  refreshes your recollection.  I don't want you to necessarily

2  testify from the timeline, if that doesn't help you remember.

3  Okay?

4          THE WITNESS:  Okay.

5          THE COURT:  But if it helps you remember, that's great.

6          THE WITNESS:  Okay.

7  BY MR. MCNICHOLAS:

8    Q  In June of 2011, what was the circumstances under which you

9  were asked to go to Las Vegas?

10   A  Dr. Dason told me that there was going to be a dental

11  convention and that Dr. Rocha and his wife and the Indio office

12  would be attending as well.

13   Q  I misspoke when I asked the question.  It was May.

14          Do you have a recollection of that?

15   A  Yes.

16   Q  Okay.  So did you want to go to the dental convention?

17   A  No.

18   Q  How many times were you asked to go to the dental

19  convention?

20   A  He asked me several times.

21   Q  Did you ultimately agree to go to the dental convention?

22   A  Yes.

23   Q  Why did you agree to go?

24   A  Because I was going to go with another coworker, Karen.

25   Q  Was the coworker invited?

26   A  Yes.

1    Q   By whom?

2    A   By me.

3    Q   Did you tell Dr. Dason that you were going to invite the

4    coworker?

5    A   Yes.  I told him that I would only go if she would go.

6    Q   And did you both, in fact, go to Las Vegas?

7    A   Yes.

8    Q   How did you get there?

9    A   He picked us up and drove us there.

10   Q   And when you arrived, where did he take you?

11   A   To the hotel.

12   Q   Do you remember the name of it?

13   A   No.

14   Q   And where did you all stay at the hotel?

15   A   (No audible response.)

16   Q   Do you understand the question?

17   A   No.

18   Q   Did you all stay in the same unit?

19   A   Yes.

20   Q   Was this a hotel or a condominium?

21       Can you describe that?

22   A   It was a condo-styled hotel.

23   Q   And was the housing all in one condominium?

24   A   Yes.

25   Q   And did you have separate rooms?

26   A   Yes.

1   Q   And who did you stay with in your room?

2   A   Karen.

3   Q   And so when you arrived, was that a Friday?

4   A   Yes.

5   Q   At what time?

6   A   Around 9:00 or 10:00.

7   Q   And when did you depart Las Vegas?

8   A   Sunday morning.

9   Q   During the period of time that you were in Las Vegas, did

10  you all stay in that unit?

11  A   Yes.

12  Q   And the first night you arrived, what occurred?

13  A   The first night we got there, we walked upstairs, and then

14  he let us know that we were all going to be staying in the same

15  room if that was okay.

16      So we agreed, and we went inside into our rooms, and then

17  just went to sleep.

18  Q   Okay.  And then the next morning you woke up, and what did

19  you do the next morning?

20  A   He told us to just get ready and wear comfortable clothes.

21  So we got ready, and then we left.

22      He drove us to another hotel where a bus picked us up and

23  then drove us to go zip-lining.

24  Q   Zip-lining?

25      At any point in time during the weekend, did you go to a

26  dental convention?

1    A   No.

2    Q   Did you ever ask him about the dental convention?

3    A   No.

4    Q   So you went zip-lining and then after zip-lining, what did

5    you do?

6    A   We went to go eat at a buffet.

7    Q   And what time did you finish eating at the buffet?

8    A   I believe it was around maybe 5:00 -- sometime in the

9    afternoon.

10   Q   And at that point in time, did you return to the place you

11   were staying?

12   A   Yes.

13   Q   And were there any activities that night?

14   A   Yes.  He told us he had a surprise for us and to get ready.

15       So he took us to Planet Hollywood Hotel, and he we went

16   to go watch a show called "Peep Show."

17       MCNICHOLAS:  Okay.  And I would like to mark, as Exhibit

18   No. 1, a flyer for what purports to be a flyer of the "Peep

19   Show".

20       I'll hand this to your clerk, your Honor.

21       (Exhibit No. 1 identified.)

22   BY MR. MCNICHOLAS:

23   Q   Do you recognize what's depicted in Exhibit No. 1?

24   A   Yes.

25   Q   What is that?

26   A   That was the poster for the show.

1   Q  And did you actually attend the show?

2   A  Yes.

3   Q  And can you generally describe what the show was about?

4   A  It was just girls dancing topless.

5   Q  And how long did the show last?

6   A  About an hour.

7   Q  Was there any conversation during this show?

8   A  No.

9   Q  How did you feel when the show was taking place?

10   A  Very uncomfortable.

11   Q  Why is that?

12   A  Because I was sitting next to my boss.

13   Q  Did you get up and leave?

14   A  No.

15   Q  Why not?

16   A  I wasn't thinking at the moment.

17   Q  Okay.  So after the show ended, what happened?

18   A  We went back to the hotel, and then we just went to sleep.

19   Q  And the next day, did you get up and go back to Los Angeles?

20   A  Yes.

21   Q  All in the same car?

22   A  Yes.

23   Q  And then on Monday, did you return to the office?

24   A  Yes.

25   Q  And then did you come into contact with Dr. Dason from time

26 to time after that?

1  A  Yes.

2  Q  During the same general time frame in or around May of 2011,

3  did Dr. Dason ever touch you in a way that you believed was

4  inappropriate?

5  A  Yeah.  He would start tickling me and rubbing on my knee.

6  Q  When he did that, did you say anything?

7  A  I would just kind of move away from him.

8  Q  And how did you feel about that?

9  A  It made me feel very uncomfortable.

10  Q  When you say it made you feel uncomfortable, could you

11  describe it in greater detail?

12     Do you remember how you felt at that time?

13  A  Yeah, just uncomfortable.

14  Q  Is there anything else you'd like to say about that?

15     Can you say anything else about that?

16  A  (No audible response.)

17  Q  Did you get up and move away when he did that?

18  A  When he would tickle me, yes, but when he was touching my

19  knee, I was assisting so I really couldn't move.  So I would just

20  kind of have to sit through that.

21  Q  Okay.  Do you remember at one point in time going to a

22  Chinese restaurant with him?

23  A  Yes.

24  Q  Were you alone with him?

25  A  No.  There was a Chinese food restaurant right next door to

26  our office, and me and Karen had gone to go have lunch there.

1    And he was there, so we sat with him.  So it was the three of us.

2      Q  And did anything occur at lunch that made you feel

3    uncomfortable?

4      A  Dr. Dason started talking about how him and Dr. Rocha went

5    to Mexico, and Dr. Rocha was with a stripper who was smoking

6    cigarettes out of her vagina.

7      Q  And was there any discussion about that?

8      A  No.

9      Q  And how did you react to that?

10     A  I just stayed quiet.

11     Q  Did Karen react to it?

12     A  No.

13     Q  So during these circumstances, why did you remain quiet when

14   they were occurring -- the peepshow, the tickling -- I know you

15   got up and walked away -- and then at the Chinese restaurant?

16     A  I would just tell Cesar about the events.

17     Q  Who's Cesar?

18     A  He's my manager at Colton Dental.

19     Q  What's Ceasar's last name?

20     A  Espinoza.

21     Q  Did you tell him about those?

22     A  I didn't tell him about the Vegas or the Laker game, but I

23   did tell him about the tickling the knee.

24     Q  And did he respond to you?

25     A  I don't recall.

26     Q  Why did you tell Cesar?

1   A  I just figured I could go to him because he was my manager.

2   Q  When you told him, did it help the situation?

3   A  No.

4   Q  And by the way, was there any written policy about sexual

5   harassment at the office?

6   A  Not that I know of.

7   Q  Were you ever trained about it?

8   A  No.

9   Q  Do you know whether or not Cesar was?

10  A  No.

11  Q  Did he ever tell you there's a policy against sexual

12  harassment at the office?

13  A  No.

14  Q  So again, same general time frame, May of 2011 --

15       Were there comments that he made to you which you felt

16  were inappropriate?

17  A  He would just stare at my breasts and say (making sound)

18  "Mommy" "Mommy."

19  Q  On how many occasions would that occur?

20  A  He would just do it throughout time.  About --

21  Q  Are you talking about the duration of your employment?

22  A  Yes.

23  Q  Do you have an estimate as to how many times that scenario

24  occurred?

25  A  Around anywhere from five to seven times.

26  Q  Okay.  So now moving forward in time, were there any times

1   when he touched you or grabbed you?

2   A   Yes.  He grabbed me.  He grabbed my butt while I was

3   developing an X-ray.

4   Q   Okay.  And can you describe that for the Court?

5   A   He just gripped my butt.

6   Q   When you say --

7       Did he actually grab it with his hand?

8   A   Yes.

9   Q   Did he hold it?  Did he brush against?

10      Can you describe that?

11  A   He just grabbed it.

12  Q   Did you say anything?

13  A   No.

14  Q   So through all the events, why haven't you said anything to

15  him?

16      Do you know why you didn't say anything to him?

17  A   I was just scared.

18  Q   What were you afraid of?

19  A   To get fired.

20  Q   Okay.  Was there any particular reason why you were afraid

21  of being fired?

22  A   Because at that point, I just got started.  I needed my job.

23  I was supporting my daughter.

24      THE COURT:  Did you say daughters or daughter?

25      THE WITNESS:  Daughter.

26  ///

BY MR. MCNICHOLAS:

Q  How old was your daughter at that time?

A  She was about four.

Q  Okay.  And did you tell -- about these other events --

      Did you tell Cesar the office manager about those?

A  Yes.  I told him about that event, but Dr. Dason, after that happened, he talked to me.

Q  Dr. Dason did?

A  Yes.

Q  When did that occur?

A  After he grabbed me, he seen that I was upset throughout the procedure, and he called me into his office.

Q  Do you have a time frame for that when it occurred, like, a year and a month?

A  It was the same day that he did that.

Q  April 20th?

A  Yes.

Q  Okay.  How long did that meeting last?

A  I would say about 30 minutes.

Q  And what did you say to him during that meeting?

A  I didn't say much to him.  He was doing most of the talking.

Q  What did he say to you?

A  He just apologized, and he said that he wouldn't do it again.  That he was very sorry.  He was just apologetic.

Q  Okay.  Did it happen again?

A  Yes.

1  Q  Okay.  When I say "it," I specifically mean did he grab your

2  butt again?

3  A  Yes.

4  Q  On how many occasions?

5  A  Two more times.

6  Q  Okay.  So moving through them in sequence, when was the next

7  time that he did that?

8  A  It was a couple months after, so around June or July.

9  Q  Of 2012?

10  A  Yes.

11  Q  And what were the circumstances under which the next

12  offensive touching where he grabbed your butt occurred?

13  A  It was the end of the day I was turning off the air

14  conditioner, and I didn't know how to work the air conditioner.

15  So I thought it was the type that you open the box.  Someone had

16  pulled it.

17      It came off the wall, and he came to the back.  And he

18  said, "You're breaking my stuff," and he grabbed the box.  And

19  when he put it back in, I reached over to switch it off, and

20  that's when he touched my butt.

21  Q  When you say he touched your butt, can you describe that?

22  A  He just -- he just grabbed it.

23  Q  Okay.  What did you do when that occurred?

24  A  I didn't say anything to him.  He just walked away, and then

25  Cesar was in the front office.  So I was crying, and I told him

26  what had happened.

1   Q   And what did Cesar say to you?

2   A   He said that I should discuss it with him with Dr. Dason.

3   Q   Did you want to do that?

4   A   No.

5   Q   Did you do that at that time?

6   A   No.

7   Q   So what did you do at that time, given the fact that all of

8   these events that you've just described had occurred?

9   A   I just continued to work there.

10   Q   Other than what was occurring with Dr. Dason, did you like

11   working there?

12   A   Yes.

13   Q   Did you like your coworkers?

14   A   Yes.

15   Q   And with respect to this conduct from Dr. Dason, how were

16   you feeling about that?

17   A   (No audible response.)

18   Q   For example, were you able to just -- when that occurred

19   were you able to just leave it at the office and go home?

20   A   No.

21   Q   Did you take it home with you?

22   A   Yeah.   Sometimes I would just -- I would be very upset about

23   what was going on.

24   Q   How would that manifest itself?

25       How would you express that?

26   A   Crying.

1    Q   Okay.  Did you have any --

2        Other than crying, did you have any physical reactions?

3    A   (No audible response.)

4    Q   Do you understand what I'm asking you?

5    A   No.

6    Q   Okay.  So for example, did it make you, in any way,

7    physically uncomfortable?  You were crying.

8        Did it make you physically nauseous or have headaches or

9    tired?

10   A   Yeah.

11   Q   Do you remember how you felt at that time?

12   A   Yeah.  I'm just not very good about expressing my feelings.

13   Q   Okay.  At that point, did you talk to anybody about it?

14   A   No.

15   Q   Did you have any girlfriends you talked to about it or

16   family?

17   A   At that point, I talked to my friend Marlene.

18   Q   Okay.  And when you talked to her, did you tell her how you

19   were feeling?

20   A   I would just tell her the situation and what was going on.

21   Q   So you didn't tell her how you were feeling?

22   A   No.

23   Q   Did you want to keep that to yourself?

24   A   Yes.

25   Q   Okay.  So was there another time when he grabbed your butt?

26   A   Yes.

Q   When did that occur?

A   I was going into a room.  As I was grabbing a glove, he once again grabbed me.

Q   In the same way that he had before?

A   He just kind of -- just touched.

Q   And did you say anything to him at that point in time?

A   No.

Q   Did you consider quitting at that point in time?

A   (No audible response.)

Q   Do you remember what you were thinking at that point in time?

A   No.

Q   Well, at any point in time along the sequence up until now, did you consider quitting?

A   Yes.

Q   And why were you considering quitting?

A   Because the situation and how it continued to happen.  I just felt that I couldn't be there anymore.

Q   Did you make a conscious decision not to quit?

A   Yes.

Q   And why did you decide not to quit while this was going on?

A   At that point, I didn't have a car to get around, and I needed my job, and my coworkers were helping me get to work, so I really felt like I didn't have an option.

Q   Okay.  So other than Dr. Dason grabbing your butt on three occasions, did he grab any other part of your body?

1   A  Yes.

2   Q  What?

3   A  He grabbed my breasts.

4   Q  On how many occasions?

5   A  One.

6   Q  Now, as you look back on this and going through this

7 timeline, did his behavior stay the same or get less offensive or

8 get more aggressive?

9   A  More aggressive.

10   Q  And when you say it got more aggressive, why do you say

11 that?

12   A  Because it started happening more frequently.

13   Q  How many times did he grab your breasts?

14   A  Once.

15   Q  And do you have a recollection as to when that occurred?

16   A  Around December of 2012.

17   Q  Can you describe for the Court the circumstances under which

18 that occurred?

19   A  He hugged me, and he was saying good-bye.  He hugged my

20 coworker, and then he came to give me a hug, and then he grabbed

21 my boob.

22   Q  And what did you do when that occurred?

23   A  Nothing.

24   Q  Why is it you did nothing?

25   A  I didn't know what to do.

26   Q  Okay.  How long did that event last?

1   A   Just a second.

2   Q   At any point in time, were you ever afraid of him?

3   A   Yes.

4   Q   What were you afraid of?

5   A   That he was going to be angry and fire me.

6   Q   Were you afraid of him firing you, or were you also afraid

7   of him being angry at you, or was it just fired or?

8   A   Angry as well.

9   Q   You were afraid that he was going to be angry at you?

10  A   Yes.

11  Q   Why were you afraid of that?

12  A   Because you can tell the type of -- how he just came off and

13  I just had a feeling if I said anything to him he would become

14  very angry.

15  Q   Okay.  And did he ever touch any other part of your body?

16  A   He put his finger in my mouth.

17  Q   Okay.  And when did that occur?

18  A   When I was yawning, he stuck his finger in my mouth, and he

19  said, "Your tongue's so soft."

20  Q   Do you want to take a moment?

21  A   No.

22  Q   So let me ask you this -- we just have a few more minutes.

23  All right?  You're very upset right now.  We're going to get some

24  Kleenex for you.  Okay.

25       So I know you don't like to, but can you describe right

26  now why you're so upset?

1    A    (No audible response.)

2    Q    Do you think you can?

3    A    (No audible response.)

4         THE COURT:  I'll tell you what, why don't we take about

5    three or four minutes or maybe five minutes?

6         MR. MCNICHOLAS:  Thank you, your Honor.

7         (Whereupon, a recess was taken.)

8         THE COURT:  Do you understand you're still under oath?

9         THE WITNESS:  Yes.

10        THE COURT:  Please continue.

11        MR. MCNICHOLAS:  Thank you, your Honor.

12

13               DIRECT EXAMINATION (RESUMED)

14   BY MR. MCNICHOLAS:

15   Q    Okay.  During the same time frame when the events occurred,

16   which you just described before the break, did Dr. Dason ever

17   display offensive cartoons to you?

18   A    Yes.

19   Q    Can you describe that?

20   A    When I was going into his office to hand him a chart, he had

21   a dancing penis on his laptop that he wanted me to take a look

22   at.

23   Q    And he actually showed it to you?

24   A    Yes.

25   Q    And what did you do?

26   A    Nothing.  I just handed him the chart, and I walked away.

1    Q   And what is the time frame on that?

2    A   Around October 2012.

3    Q   Okay.  And the last time he grabbed your breast, do you have

4    a recollection as to when that occurred?

5    A   Sometime in November 2012.

6    Q   Okay.  Now, when all these events as you just described

7    occurred, did you tell Cesar about them at this point in time?

8    A   Yes.

9    Q   What did he say, if anything?

10   A   He just -- he told me to talk to him and to talk to

11   Dr. Dason.

12   Q   Did you do that?

13   A   Yes.

14   Q   So when did you talk to Dr. Dason?

15   A   December -- the beginning of December -- December 7th.

16   Q   2012?

17   A   Yes.

18   Q   And where were you when you talked to Dr. Dason?

19   A   In his office.

20   Q   Did you just walk in?  Did you set up a meeting?

21       How did that occur?

22   A   I just asked if I can talk to him, and he said he'll talk to

23   me after lunch.

24   Q   What was your purpose in speaking with him?

25   A   To -- to make him stop putting his hands on me.

26   Q   Did you say that to him?

1    A  Not in those words.

2    Q  Okay.  So let me ask you this:

3       How long did that meeting last?

4    A  I believe about an hour -- a little bit over an hour.

5    Q  You spoke during the meeting; right?

6    A  Yes.

7    Q  And he spoke during the meeting; right?

8    A  Yes.

9    Q  Do you remember who did most of the speaking?

10   A  Dr. Dason.

11   Q  Can you tell the Court what you expressed to Dr. Dason

12  during that meeting?

13   A  I just started by telling him about how he said he wasn't

14  going to put his hands on me anymore and that he -- then he just

15  started to talk.

16   Q  And what did he say to you?

17   A  He apologized and said that -- that he slips at times.

18   Q  Did he say anything else?

19       The meeting lasted a long time; right?

20   A  Yes.

21   Q  About an hour to an hour and a half?

22   A  Yes.

23   Q  Do you remember what else he said?

24   A  He just said that -- that he just slips and that he --

25   Q  Do you remember anything else he said?

26   A  That I had an attractive smile, and it was hard to stay away

1  from.

2    Q  Okay.  What else did he say?

3    A  He just apologized.

4    Q  Okay.  Was there a resolution at the end of the meeting?

5    A  Yes.

6    Q  Okay.  How did the meeting resolve?

7    A  He just said he was going to try his best to stay away, and

8  I believe that was it.

9    Q  Did you accept that to be true?

10   A  Yes.

11   Q  All right.  And then shortly thereafter, though, you walked

12  off the job?

13   A  Yes.

14   Q  When did that occur?

15   A  January 17th, 2013.

16   Q  Why did you walk off the job?

17   A  Because things didn't end up getting any better.

18   Q  Okay.  Did you have any conversations with him before

19  January 17th?

20   A  Yes.

21   Q  And after December 7th?

22   A  Yes.

23   Q  What conversations did you have?

24   A  We spoke about my raise.

25   Q  Had you spoken to him about a raise before?

26   A  Yes.

1    Q   When's the first time you spoke to him about a raise?

2    A   In 2012.

3    Q   Okay.  What were the circumstances under which you spoke to

4    him about a raise in 2012?

5    A   I had become the back office manager, so I was speaking to

6    him about my raise.

7    Q   In his office?

8    A   Yes.

9    Q   Did you ask him for a raise?

10   A   I had asked Cesar, and Cesar told me that I needed to talk

11   to Dr. Dason.

12   Q   Okay.  So when you talked to him, did you ask him for a

13   raise?  Dr. Dason, I mean.

14   A   Yes.

15   Q   In his office?

16   A   Yes.

17   Q   And what did he say to you?

18   A   He said my raise would depend if I show him a good time.

19   Q   And how did you respond to that?

20   A   I just didn't say anything to him.

21   Q   And when he said that to you, how did you interpret that?

22       What did you think he meant?

23   A   (No audible response.)

24   Q   At that time, did you form an impression in your mind as to

25   what he meant by that statement?

26   A   Yes.

1   Q   Okay.  So can you describe for the Court what you thought

2   that meant?

3   A   I had to take him out or do something with him.

4   Q   Okay.  So then you'd asked for a raise again in December?

5   A   Yes.

6   Q   When did that occur?

7   A   I asked for a raise in January.  I'm sorry.

8   Q   Okay.  January of 2013?

9   A   Yes.

10  Q   Okay.  Was that during that same meeting, or was it after?

11      I'm referring to the same meeting you described -- the

12  meeting on December 7th, 2012.

13  A   It was the second meeting.

14  Q   Okay.  So when did that meeting occur?

15  A   In the beginning of the year.

16  Q   In January?

17  A   Yes.

18  Q   Right.

19      And where did it occur?

20  A   In his office.

21  Q   For how long did it last?

22  A   About 20, 30 minutes.

23  Q   Right.  And you went and asked him for a raise?

24  A   Yes.

25  Q   So can you describe the circumstances?

26      You'd had this meeting in December; right?

1    A   Yes.

2    Q   2012.  Where you're raising the issue about all the events

3    that occurred?

4    A   Correct.

5    Q   So how was it then that you came to ask him for a raise in

6    January?

7    A   It was the beginning of the year, so when I went to go ask

8    him -- me and Cesar had spoke about the raise.  Because the first

9    raise that he gave me -- he kind of seemed upset about the

10   situation because I didn't do what I requested so he --

11   Q   Okay.  So when you're talking about that, are you talking

12   about the prior conversation you had in 2012?

13   A   Yes.

14   Q   So you did receive a raise at that time?

15   A   Yes.

16   Q   Of how much?

17   A   A dollar.

18   Q   And you didn't show him a good time?

19   A   No.

20   Q   And did he raise that issue then in 2013 when you were

21   discussing this raise?

22   A   He just said my raise would depend if I were to go to Vegas

23   with him.

24   Q   Did he elaborate on that?

25       Did he say why he wanted you to go to Vegas or when?

26   A   He said in about six months when his wife would go to India.

1    Q   And did you respond to that?

2    A   No.

3    Q   And is it around that time you walked off the job?

4    A   Yes.

5    Q   Why did you walk off the job?

6    A   I just felt it wasn't going to stop there.

7        We had another conversation where he was really upset

8    because I wouldn't go to lunch with him, so he just said it was

9    going to be very difficult for me to continue to work there since

10   I wasn't getting on a personal level with him.

11   Q   And once you left, did you feel better?

12   A   No.

13   Q   Can you describe how you felt after you left?

14       Did you have negative feelings?

15   A   Yes.

16   Q   Did you talk to any of your girlfriends about it?

17   A   No.

18   Q   At some point in time, did you go to a group counseling

19   session?

20   A   Yes.

21   Q   When did that occur?

22   A   I believe it was the end of February or the middle of

23   February.

24   Q   Of 2013?

25   A   Yes.

26   Q   Is that the County of San Bernardino services?

1    A   Yes.

2    Q   Why did you go to group counseling?

3    A   Because I felt I really needed it.

4    Q   What about in that moment made you feel like you needed to

5    go to group counseling?

6    A   I started feeling really depressed.  I didn't know what to

7    do.

8    Q   Were you working at that point in time?

9    A   No.

10    Q   Was your daughter living with you?

11    A   Yes.

12    Q   How old was she at that point in time?

13    A   Five or six.

14    Q   And at the group counseling, did you describe how you were

15    feeling?

16    A   No.

17    Q   Okay.  Did you have a hard time at the group counseling

18    expressing your feelings like you are today?

19    A   Yes.

20    Q   At some point in time, did you go see Dr. Kania?

21    A   Yes.

22    Q   And did you tell him how you were feeling?

23    A   Yes.

24    Q   Did you have a difficult time expressing how you were

25    feeling about this situation?

26         Do you know why it is you have such a difficult time

1  expressing your feelings about this?

2   A  I just -- I just don't really tell people.  I don't express

3  how I feel.  I just keep it to myself.

4   Q  Why do you do that?

5   A  I don't know.

6   Q  Did the group therapy help you?

7   A  Yes, a little bit.

8   Q  How many times did you go?

9   A  About six to nine times.

10   Q  And as you sit here today, can you describe how you feel?

11      Are you embarrassed about this?

12   A  Yes.

13   Q  Can you tell the Court why you're embarrassed?

14   A  (No audible response.)

15   Q  Do you want me to ask you a different question?

16   A  Yes.

17   Q  Do you feel angry about this?

18   A  Yes.

19   Q  Can you describe that?

20      Are you mad at Dr. Dason?

21   A  Yes.

22   Q  Are you mad at the situation?

23   A  Yes.

24   Q  Okay.  So you're currently employed; right?

25   A  Yes.

26   Q  Do you feel good about that?

1    A  Yes.

2    Q  And what's your current position?

3    A  Dental assistant.

4    Q  Okay.  And what was your last position when you left

5  Dr. Dason?

6    A  I was a back office manager.

7    Q  And how long have you been employed now?

8    A  A little bit over three years.

9    Q  And what is the name of your employer?

10   A  Chintana Luke.

11   Q  And do you intend on staying there?

12   A  Yes.

13   Q  And do you work for a man or woman or both?

14   A  A woman.

15   Q  Have you had any issues with your employment there?

16   A  No.

17   Q  And when you left your employment with Dr. Dason, do you

18  have a recollection as to how much money you were making?

19   A  I believe 11 -- 11.

20   Q  $11?

21   A  Yes.

22   Q  So I just handed you a document which purports to be a W-2

23  wage and tax statement from 2012.

24       Do you have that in front of you?

25   A  Yes.

26   Q  And I will mark this as plaintiff's next in order, which is

1    number 2.

2        And is this an accurate description of your wages in

3    2012?

4    A  Yes.

5        (Exhibit No. 2 identified.)

6    Q  And how many hours a week did you work in 2012?  Do you

7    remember?

8    A  (No audible response.)

9    Q  It's not going to be on that document.

10       So the question is, do you remember?

11   A  I would work 40 -- 40 plus hours a week.

12   Q  So when you say "plus," do you have a number for how many

13   more hours a week you would work overtime?

14   A  About an average of 30 minutes a week overtime.

15   Q  Do you remember -- I'm sorry.  I asked you a bad question.

16       The total time that you were employed by Dr. Dason, do

17   you know how many weeks that was?

18   A  No.

19   Q  If I told you 117 weeks, would that refresh your

20   recollection?

21   A  Yes.

22   Q  Do you remember how many months you worked for Dr. Dason?

23       Don't guess if you don't know.

24   A  Around 25.

25   Q  And during the period of time, did you get rest breaks?

26   A  No.

1   Q  Did you ever raise the issue to Cesar or Dr. Dason or

2   anyone?

3   A  Yes.

4   Q  About rest breaks?

5   A  Yes.

6   Q  And about overtime?

7   A  Yes.

8   Q  And what was the response?

9   A  Cesar says that Dr. Dason doesn't pay for overtime and that

10  there is no rest breaks.

11  Q  I'm now going to hand you another document which we will

12  mark as Exhibit No. 3 -- ask you to take a look at that.

13        MR. MCNICHOLAS:  For the record, this record purports to

14  be a W-2 from Chintana Luke from 2013.

15  BY MR. MCNICHOLAS:

16  Q  Do you recognize this document?

17  A  Yes.

18  Q  And does that accurately reflect your income for that year?

19  A  Yes.

20  Q  And when you left Dr. Dason's employ, how much money were

21  you making?

22  A  11.

23  Q  And when you began your employment at Chintana Luke, how

24  much money were you making?

25  A  11.25.

26  Q  And how many hours were you working at Chintana Luke in a

1    week?

2    A  I was only part time.  Under like 27 hours, 26 hours.

3    Q  Okay.  So when you were at Dr. Dason, you were working about

4    42 or so?

5    A  Yes.

6    Q  And when you went to Chintana Luke, you were working part

7    time about 27 hours?

8    A  Yes.

9    Q  So you lost income?

10   A  Yes.

11   Q  And you lost income during the period of time you were out

12   of work?

13   A  Yes.

14   Q  And at some point in time at Chintana Luke, did your income

15   go back up?

16   A  Yes.

17   Q  So for example, right now how much are you making an hour?

18   A  12.25.

19   Q  And do you know what point in time you started making the

20   same amount of money at Chintana Luke that you made at

21   Dr. Dason's office?

22   A  Sometime in 2014, I believe the beginning of the year.

23        MR. MCNICHOLAS:  Nothing further, your Honor.

24        THE COURT:  Thank you.

25        MR. MCNICHOLAS:  You can step down now.

26        THE COURT:  Call your next witness.

1    MR. MCNICHOLAS:  Thank you, your Honor.  The plaintiff

2    will call Dr. Kania.

3    THE JUDICIAL ASSISTANT:  Do you solemnly state that the

4    evidence you shall give in this matter will be the truth, the

5    whole truth, and nothing but the truth, so help you God?

6    THE WITNESS:  I do.

7    THE JUDICIAL ASSISTANT:  Thank you please be seated.

8    THE COURT ATTENDANT:  Please state and spell your full

9    name for the record.

10    THE WITENSS:  Michael Kania; M-i-c-h-a-e-l, K-a-n-i-a.

11    THE COURT:  Proceed.

12    MR. MCNICHOLAS:  Thank you, your Honor.

13

14                    MICHAEL KANIA,

15    called as a witness by and on behalf of the Plaintiff, having

16    been first duly sworn, was examined and testified as follows:

17

18                  DIRECT EXAMINATION

19    BY MR. MCNICHOLAS:

20    Q  Dr. Kania, what is your stated profession?

21    A  I'm a clinical forensic psychologist.  I have a private

22    practice.

23    Q  And have you ever qualified to testify in your area of

24    expertise in a court of law?

25    A  Yes, I have.

26    Q  On how many occasions?

1   A   Oh, probably over the years, a few hundred times.

2   Q   And can you please briefly state your educational

3   background?

4   A   Sure.

5       I completed my bachelor's degree in psychology from Cal

6   State Fullerton.  I then went to the University of Utah, where I

7   completed a master's degree in May of 1976.

8       I then did a one-year predoctoral internship where I

9   functioned as a psychologist while being supervised at Patton

10  State Hospital here in San Bernardino.

11      I then returned to the University of Utah where I worked

12  for Salt Lake Community Mental Health and completed my Ph.D. in

13  clinical psychology in May of 1979.

14      I then was asked to return to Patton Hospital, and worked

15  there as a staff psychologist.  And during the first year that I

16  was there, I received a postdoctoral supervision so that I could

17  qualify for the state licensing exam.

18      I took that, and I've been licensed here in California

19  since July of 1980.

20  Q   And at some point in time, did you enter into private

21  practice?

22  A   Yes.  I worked at Patton Hospital for about another seven

23  years and then during that time, I began a private practice

24  working a part-time basis and then left the hospital.  I have

25  been working in private practice ever since.

26  Q   If my understanding is correct, you went into private

1  practice in 1987?

2    A  Well, went into full-time private practice in 1987.  I had

3  done some court work prior to that.

4    Q  And when you went into private practice, did you have an

5  area of specialty?

6    A  Yes.  It was the clinical forensic psychology.

7    Q  And currently are you in private practice?

8    A  Yes, I am.

9    Q  And do you have a business name or a name which you're doing

10  business of?

11    A  No, just my name, Michael Kania, Ph.D.

12    Q  And can you describe generally what your practice consists

13  of?

14    A  It consists primarily of doing psychological evaluations.

15  I'm on the panel of examiners for the Riverside Superior Court

16  and San Bernardino Superior Court and have been for the last

17  35 years.

18       I've also served as a medical expert for the Social

19  Security Administration Office of Disability, Adjudication, and

20  Review.  So I served as a medical expert reviewing psychological

21  records for hearings where there are appeals for social security

22  benefits.

23       And then I also do evaluations for private attorneys,

24  dealing with such issues such as substance abuse, custody

25  evaluations, sexually violent predator evaluations, mentally

26  disordered evaluations -- just a number of different types of

1  evaluations where the issue is, first of all, identifying any

2  psychological disorder and then addressing the legal criteria.

3    Q  And at some point in time, you saw Ms. Olivares?

4    A  Yes, I did.

5    Q  And you were also present in the courtroom for her

6  testimony?

7    A  Correct.

8    Q  Do you have a recollection as to when you saw Ms. Olivares?

9    A  I saw her on May 22nd of last year, 2015.

10   Q  And what was your purpose in so doing?

11   A  My purpose was to evaluate her, to determine if she suffered

12 from any psychological or emotional problems that may have been

13 the result of her claim of sexual harassment at the workplace.

14   Q  Can you describe your process of evaluation at that time?

15   A  Yes.

16       I started out by introducing myself and explaining to her

17 the reason and purpose of the evaluation and what she could

18 expect over the course of the evaluation.

19       I then questioned her about various aspects of her

20 life -- where she was born, where she grew up, what her childhood

21 was like.

22       I questioned her about her educational history, her

23 vocational history, if there was any instance of substance abuse,

24 and also if she'd ever received any psychological treatment prior

25 to meeting with me.

26       I also questioned her about just a number of symptoms --

1    asking her if she experienced certain symptoms and if she

2    indicated that she had, then I would follow up and get more

3    detailed about those symptoms -- when they began, how severe they

4    were, things like that.

5         I questioned her about what had happened at her -- at the

6    workplace, why she felt that she was sexually harassed, and then

7    at the end of the evaluation, I had her complete the Minnesota

8    Multiphasic Personality Inventory so that I could get some

9    additional information from that test.

10   Q  Did you find her to be a reliable historian?

11   A  Yes.

12   Q  What was your purpose in administering the MMPI?

13   A  I administer it for two reasons.

14        First of all, it's a way to get additional information,

15   and it's oftentimes the case that people can read questions,

16   answer them more quickly than going through the 567 items.

17        It also is an objective test.  So I send it in.  I have

18   it scored by a Caldwell report.  So it's an objective test that's

19   objectively scored.

20        And then I also use it to compare her responses to those

21   of other people who have obtained similar profiles on the MMPI.

22   It gives me an idea of what sorts of problems she is likely to be

23   experiencing, and then I use it as a check on myself.

24        I can then look and see what she reported to me during

25   the evaluation and compare it with how that matches up with the

26   MMPI.

1   Q   Did you form an impression of your patient?

2   A   Yes, I did.

3   Q   And was part of the basis the results of the MMPI?

4   A   That was part of it, yes.

5   Q   And was part of the basis the history?

6   A   Yes.

7   Q   Was there anything of particular significance -- well, I

8   guess it would be in the Caldwell report -- that you relied on in

9   forming your impression?

10   A   I guess I would have to say that it was -- it confirmed my

11   impression after having spoken with her for a number of hours,

12   and that was that she was severely depressed, that many of the

13   symptoms she had reported to me during the time that I spoke with

14   her were also reported on the MMPI.

15        The MMPI indicated that she was honest and

16   straightforward.  There was no indication of any malingering or

17   any exaggeration of any symptoms, and it also suggested the

18   possibility of some symptoms which would be consistent with the

19   post-traumatic stress disorder.

20        So the primary symptoms that I saw were consistent with a

21   severe depressive disorder and a post-traumatic disorder.

22   Q   Are those both DSM diagnoses?

23   A   Yes.

24   Q   With respect to the history, was there anything remarkable

25   in the history that you relied on?

26   A   Well, I think what was remarkable was these symptoms didn't

1  begin until the period of time after -- while she was still

2  working for the dental office, and then they worsened towards the

3  end when she eventually left work and worsened still after that.

4        And even though I was seeing her at that point two and a

5  half years afterwards, she was still -- well, as she was today --

6  still very emotionally upset about what had happened and had

7  great difficulty talking about it.

8  Q   Okay.  And so as a result of your history, of your

9  administering your report, your impression of the patient, you

10  arrived at a diagnosis; correct?

11  A   That's correct.

12  Q   And is that the severe depression and the post-traumatic

13  stress disorder?

14  A   Correct.

15  Q   Both DSM diagnoses?

16  A   That's correct.

17  Q   Can you describe generally for the Court when you say

18  "severe depression," what that means?

19  A   Well, severe depression means, first of all, that she's

20  experiencing a number of symptoms, and in her case, she talked

21  about being depressed, being tearful on a daily basis.

22        She expressed she had gained weight.  She had trouble

23  sleeping.  She was more irritable.  She had some difficulty

24  concentrating.

25        So all of those things are consistent with the diagnosis

26  of a depression.  I felt that she was severely depressed because

these are symptoms that had been going on for two, two and a half years, and they were causing an impairment of her functioning in the sense that she attempted to deal with the depression by keeping as busy as possible.

But then once there was some downtime, the symptoms would kind of come up, and she couldn't ignore them. And so she found herself, as I say, having trouble sleeping, having trouble concentrating, things like that.

Q  And with respect to the post-traumatic stress disorder, can you describe to the Court what that means in lay terms?

A  Sure.

It's a response to a traumatic situation that a person experiences. There is some overlap with the symptoms of depression but in her case, she talked about having frequent dreams, being bothered by intrusive thoughts about what had happened, how the doctor had treated her.

She also I guess kind of the overlap of those two disorders, talked about feelings of betrayal. She had gone there hoping -- at one point, when the doctor said he wasn't going to touch her anymore, that he would keep that promise, but he didn't, and her disappointment in feelings of betrayal from the office manager to whom she reported what was going on. And she felt that he kind of left it up to her to deal with it and hadn't helped her in any way.

Q  Prior to Ms. Olivares, had you treated or seen any other patients which reported a history of sexual harassment?

1   A  Yes.

2   Q  On how many occasions?

3   A  You know, in cases where I specifically did the evaluations,

4   probably -- where that was the issue -- probably 10 to 15 cases,

5   but then other cases, for example evaluating charts for Social

6   Security Administration, there were many times when that was also

7   an issue.

8   Q  Was there anything noteworthy in Ms. Olivares' history which

9   contributed to your impression of the severity of depression?

10   A  Well, there were a couple of things.

11        One, when she talked about her history of working or

12   going to school, there was no indication of any significant

13   psychological or emotional problems prior to her working at the

14   dental office.

15        And so there was no indication that she had ever suffered

16   from any severe emotional or psychological problems prior to that

17   time.

18   Q  How about anything in her childhood history -- anything

19   noteworthy?

20   A  Yes.  She indicated that there was some -- her parents

21   divorced at an early aged.

22        She reported being sexually molested by her grandfather

23   when she was about four years old and later, I think in her early

24   teens, revealed that to her mother, and a report was made.  It's

25   my understanding that there were some -- at least some

26   investigation of that.

1    Q  Did you form the impression that when she gave you that

2    history that she was a reliable historian?

3    A  Yes, in part, because other information kind of

4    cross-checked as we went through her biographical history, things

5    that she had told me earlier were consistent with things that she

6    told me later.  So I felt that there was consistent sea and

7    reliability.

8    Q  Did you form the impression that your diagnosis of severe

9    depression and post-traumatic stress disorder -- that those

10   diagnoses were severe because of the fact that she'd been

11   previously sexually abused?

12   A  My impression was that the symptoms that she was

13   experiencing were primarily related to what had happened at the

14   dental office because there was no indication prior to that that

15   she had suffered any severe emotional problems as a result of

16   having been molested at the age of four.

17       I did have the impression that this may have contributed

18   or this may have brought up some of those old feelings that she

19   had had about having been molested by her grandfather.

20   Q  When she gave you a history and you were forming an

21   impression, did she have any difficulty expressing her feelings?

22   A  Oh, yes, throughout her evaluation.

23   Q  Do you have an opinion about why that is?

24   A  Well, I asked her, and what she told me -- she was very

25   anxious, very tearful as the interview began.  And she indicated

26   that she was very frightened about how she was feeling, what her

1   emotions were.

2         So I reassured her that we would be taking things slowly,

3   and we started out talking about school and background and work,

4   and it was only as she calmed down and we were able to talk about

5   some of the symptoms she had, that she had that she was able to

6   express herself a little more freely.

7         But again she was tearful throughout the evaluation.  I

8   had noted previously when I reviewed the second deposition that

9   she had given, that she had a similar problem during that time.

10        So I wasn't at all surprised, but she had great

11  difficulty talking about her emotions.

12   Q  Have you formed an opinion as to her prognosis?

13   A  Yes.

14   Q  And what is your opinion in that regard?

15   A  I think her prognosis is good in the sense that she had

16  never had any serious or psychological or emotional problems

17  before this.

18        She had functioned well.  She was caring for her child.

19  Those sorts of things it indicated that she had the resources but

20  that she was still being bothered significantly by the depression

21  primarily, and that would take some time to resolve.

22   Q  Okay.  And based on that, did you form an impression of any

23  future care and treatment that would be necessary?

24   A  Yes.

25   Q  And what is that?

26   A  Well, I felt that, first of all it would be important for

her to see a psychiatrist so she could have an evaluation to
determine if antidepressant and antianxiety medication would be
helpful for her and that ever after she was evaluated -- and I
believe she would have been prescribed medication -- that it
would be important for her to see a clinical psychologist in
weekly therapy to deal with, first of all, the feelings of
depression that were severe, to help relieve some of those
feelings but also as the therapy progressed, to talk to the
symptoms she was experiencing specifically related to the sexual
abuse.

So she reported feeling guilty, feeling dirty.  She
reported -- wondering why this had happened to her and trying to
understand what had happened.

So those sorts of things would have to be the focus of
therapy once the depression was controlled and stabilized.

Q  And what would the duration be?

A  I would say at least a year of therapy, probably a little
longer than that.

Q  Do you have an understanding, in the San Bernardino area,
how much any therapy or psychiatric intervention would cost based
upon her current condition?

A  My understanding is that a psychiatrist in an initial
evaluation would probably charge around $300, in this area and
that subsequent appointments that might be on every two- or
three-month basis would be about the same and that individual
therapy with a clinical psychologist -- the rate would probably

1  be about $125 per hour so 125 per week for that therapy over a

2  period of a year, year and a half.

3       MR. MCNICHOLAS:  Nothing further.

4       Thank you very much.

5       THE WITNESS:  Thank you.

6       THE COURT:  Brief argument or summation?

7       MR. MCNICHOLAS:  I guess, your Honor, what I would like

8  to say is what Ms. Oliveras has expressed is a classic example of

9  how a sexual predator works.

10      It is a progression of grooming and escalating behavior

11  which is designed to exert power over, in this case,

12  Ms. Olivares, based upon his position and authority over her and

13  because he knows that she has a four-year-old daughter at home.

14      Because of that -- and the Court heard her testimony --

15  it leads to tremendous humiliation, degradation.  It leads to a

16  sense of anxiety and fear, and as Dr. Kania just described,

17  ultimately to depression and post-traumatic stress disorder.

18      So as a result of these things, she's entitled to under

19  the law in this case -- I'm speaking directly to the noneconomic

20  damages -- she's entitled to compensation for, as she described

21  it on the witness stand -- hostile work environment, sexual

22  harassment, would be Category 1.

23      Is there a pen for this?  Just so I can make it a little

24  more clear.

25      THE COURT:  Yes, there should be one.

26      MR. MCNICHOLAS:  So with respect to the hostile work

1  environment, that's going to go past because she's out of it,

2  but that's one category.

3       Then we have the quid pro quo, which is also going to be

4  past.  And then we have future, which is based upon Ms. Olivares'

5  testimony, as well as Dr. Kania's (drawing).

6       So here we have -- continues throughout her employment,

7  all of those things to which she described.  We have the quid pro

8  quo.

9       And just briefly, the quid pro quo -- it occurred

10 specifically on two occasions about a year; part one, the first

11 time when she asked for a raise, and she said that he said it's

12 contingent upon you showing me a good time, then the last time

13 when she went to the hour-and-a-half meeting in January of 2013

14 during which he said go to Vegas and that didn't occur.

15      So finally, she was at her breaking point, so she walked

16 off the job which is Equivalent 2 of constructive termination

17 under the Turner vs. Busch standard, that no reasonable person

18 would be expected to endure that type of employment environment.

19      So I would recommend on the hostile work environment, for

20 that period of time, a figure of $350,000 based upon the conduct,

21 also based upon the fact that she acted reasonably within the

22 scenario.

23      She went to her manager.  She tried to talk to Dr. Dason,

24 and she was shut down every time.  She's also in a situation

25 where she's feeling completely trapped and powerless, and that is

26 a feeling that doesn't go away, even though she's out of the

1   situation.

2          With respect to the quid pro quo, I'd recommend a figure

3   of $250,000 because it was less extreme.  Although, in these

4   cases, when you condition the person's very employment on a

5   request for sexual favors, it has a devastating psychological

6   effect.

7          Because especially for someone like Ms. Olivares -- we

8   all go to work.  We all wear a uniform.  The Court has a robe.  I

9   have a suit.  She had an identity.

10          So not only does this degrade the person and humiliate

11  them and give them a sense of lacking security, it also strips

12  them of their identity which she spent a lot of time rebuilding,

13  in which we heard when Dr. Kania was discussing severe

14  depression -- not mild, not moderate -- severe depression and

15  post-traumatic stress disorder.  Those are both clinical

16  diagnoses from the DSM.

17          Additionally, and significantly, because she gives a

18  history of sexual abuse as a child, it now is brought to the

19  forefront.  So she's dealing with it during the period of time

20  she's employed and into the future now.  So for the future, I

21  would request a figure of $500,000.

22          Dr. Kania describes a treatment period of one year to a

23  year and a half -- the figures which he also reported -- and I'm

24  going to have my esteemed counsel add those numbers up for the

25  Court.  That's the treatment period, but that doesn't mean that

26  this issue ever leaves her.

1    Once you've had that treatment, the thing is that's the

2  most they can do for you.  It's over.  So she will end up living

3  with this moment for the rest of her life, especially because of

4  her prior history of childhood sexual abuse.

5    THE COURT:  And the economic loss?

6    MR. MCNICHOLAS:  The economic is in two categories, and

7  that is the future medical cost and the back pay for

8  wage-and-hour.

9    So the future medical cost, pursuant to Dr. Kania's

10  testimony, 125 times 52 weeks if you assume a year, that's $6,500

11  and at a year and a half, that would be $9,750.  That's for

12  counseling.  If you took the average at 1.25 years, that would be

13  $8,125 -- again for counseling for future medical costs.

14    For future psychiatric, 300 an hour times five visits per

15  year at 125 -- 1.25 years is $1,875.

16    THE COURT:  That was Kania's testimony?

17    MR. MCNICHOLAS:  That was.

18    THE COURT:  Okay.  With respect to the lost income?

19    MR. MCNICHOLAS:  Okay.  So pursuant to Ms. Olivares'

20  testimony and Exhibit 2 and Exhibit 3, 2012 W-2, 2013 W-2, her

21  earnings went from $21,013 on an annual basis to $14,277 on an

22  annual basis.  The difference is $6,735.22.

23    If I may, there's two more elements of damage.  One is --

24  and I understand that we have about 13 minutes to get this into

25  evidence, so we will do this -- is the wage-and-hour damages,

26  which Mr. Panitz has done the analysis on.

1       Then the last element is going to be the fee application,

2  for which we have a declaration, and we could submit.  I don't

3  know whether you want testimony on this or if you just want the

4  declaration.

5       THE COURT:  We'll submit on the declaration.  The

6  punitive damages -- you've asked me for ten percent?

7       MR. MCNICHOLAS:  Ten percent of compensatory.

8       THE COURT:  Okay.

9       Mr. Panitz?

10      MR. PANITZ:  Yes, your Honor, with regard to the

11  wage-and-hour damages that Ms. Olivares testified to, she

12  testified that she worked two hours of overtime that was unpaid

13  and at an overtime rate of one and a half times her $11 per hour

14  hourly rate, that would be $16.50 per hour, times two hours per

15  week is $33 per week, times 117 weeks is $3,861.  And that's

16  pursuant to Labor Code sections 510 and 1194.

17      THE COURT:  Okay.

18      MR. PANITZ:  Ms. Olivares also testified that she was not

19  allowed to take rest breaks and Labor Code 226.7 allows for

20  waiting time -- I'm sorry -- rest break penalties of one hour's

21  pay per day for each day that she's not given rest breaks.

22      In this case, Ms. Olivares testified that she worked four

23  days per week at $11 per hour, being her hourly rate, or $44 per

24  week rest break penalties, times 117 weeks is $5,148 pursuant to

25  Labor Code 226.7.

26      Ms. Olivares testified that she complained about not

1  getting rest breaks and not getting paid overtime, and her

2  employer expressly told her -- Cesar Espinoza told her that

3  Dr. Dason does not pay overtime or allow rest breaks and for

4  that, Labor Code section 203, suggests that there should be

5  waiting time penalties because the employer's refusal to properly

6  pay the employees was intentional.

7       In this case, the waiting time penalties are calculated

8  as 30 days' pay, at eight hours per day, at $11 per hour, and her

9  waiting time penalties are, therefore, $3,630.

10      In addition to the Code --

11      THE COURT:  3,000 --

12      MR. PANITZ:  $630.

13      THE COURT:  Okay.

14      MR. PANITZ:  Together, those three amounts total to

15  $12,639.  That amount has remained completely unpaid for the last

16  three years.

17      The law allows for prejudgment interest at the rate of

18  10 percent per year, on the whole amount, three years at ten

19  percent is prejudgment interest in the amount of $3,791.70 and

20  because that amount grew, literally linearly over the two years

21  she was employed, she's also entitled to two years prejudgment

22  interest on half the amount for two years, which is an additional

23  $1,263.90.  Together, the prejudgment interest is $5,055.60.

24      Her total wage-and-hour damages, therefore, $17,694.60.

25      THE COURT:  Okay.  Having heard the evidence and as well

26  as the arguing of counsel, the Court finds that there is

1  sufficient evidence that has been admitted to show that as a

2  result of the conduct committed by Dr. Dason, that he did cause

3  severe emotional distress and post-traumatic stress disorder

4  which was a direct result of the inappropriate actions that he

5  committed while Ms. Olivares was working with him.

6        The Court will find good cause to grant all the economic

7  damages requested -- which I'm not going to recite, but you

8  already have those figures -- all those economic damages which

9  would be the future medical and including the wage money loss.

10       With respect to the noneconomic damages, the Court rules

11  as follows:

12       As to the hostile work environment, the amount of

13  $300,000; the amount as to the quid pro quo, the amount of

14  $200,000.  That would be a total of 500,000.  For future loss,

15  that would be $500,000.  That would be a total of $1 million on

16  the noneconomic losses.

17       With respect to the punitive damages, the Court will

18  grant ten percent of the total amount as a satisfactory amount

19  for punitive damages for the inappropriate conduct of Dr. Dason.

20       Prepare an order for the Court's signature.

21       MR. PANITZ:  Yes, your Honor.

22       Two other questions or requests of the Court, that

23  because the offensive conduct was committed by Dr. Dason,

24  himself, the individual, that the order of these damages be

25  jointly and separately against both defendants.

26       THE COURT:  So ordered.

1    MR. PANITZ:  And in addition, because of the complex

2  nature of the case and the difficulties in proving the matter, we

3  would ask for a 2.0 multiplier on our fee application pursuant to

4  Lodestar.

5    THE COURT:  All right.

6    MR. PANITZ:  Can I mark as an exhibit my wage-and-hour

7  calculation, if it pleases the Court?

8    THE COURT:  If it's legible.

9    MR. PANITZ:  I'm very good at being legible, your Honor.

10    THE COURT:  We'll make that Exhibit 4.

11    (Exhibit No. 4 identified.)

12    MR. PANITZ:  In addition, we're going to mark my

13  declaration.

14    THE COURT:  Oh, yes.

15    MR. PANITZ:  With regard to the actual incurred costs and

16  fees, there are -- I apologize.  It's not stapled or

17  hole-punched, but I think I've given you the original; is that

18  correct?

19    THE COURT:  That's the original you gave to her?

20    MR. PANITZ:  I hope so.  I have two that are not

21  originals, so I'm hoping that's the original.

22    In addition to my time, your Honor, the Court -- I'm

23  sorry -- should give Patrick McNicholas an additional order of

24  attorney's fees at his hourly rate.

25    Mr. McNicholas has been involved in this case, for my

26  understanding, 50 hours, and his hourly rate is $900 per hour and

1   at a 2.0 multiplier, that's an additional 90,000 in attorney's

2   fees.

3           THE COURT:  I'll allow that but reduce that 800.

4           MR. PANITZ:  You mean 80,000 -- oh, the hourly rate?

5           THE COURT:  Right.

6           MR. PANITZ:  So it would be an additional $80,000 in

7   attorney's fees for Mr. McNicholas.

8           THE COURT:  All right.  Prepare everything for the

9   Court's signature.

10          MR. PANITZ:  I will do that.  And if I submit it

11  overnight, will the Court sign and enter it first thing in the

12  morning?

13          THE COURT:  Sure.

14          MR. PANITZ:  Thank you.

15          MR. MCNICHOLAS:  Thank you.

16          THE COURT:  Thank you.

17          Good luck, Ms. Olivares.

18          (Whereupon, the proceedings were concluded.)

19                          --o0o--

20

21

22

23

24

25

26

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    FOR THE COUNTY OF SAN BERNARDINO

3    --o0o--

4    DEPARTMENT S-31                    HON. JOHN M. PACHECO, JUDGE

5    JUDDY OLIVARES,                )
                                    )
6              Plaintiff,  )
                                    )
7         -vs-                )    Case No. CIVDS1300810
                                    )
8    SAM DASON,                    )
                                    )
9              Defendant.        )
     _____)

10

11

12   STATE OF CALIFORNIA        )
                                )  ss.
13   COUNTY OF SAN BERNARDINO   )

14

15

16        I, KERRI DAVERSA, Pro Tempore Reporter, of the State of

17   California, for the County of San Bernardino, do hereby certify

18   that the foregoing pages, 1 through 66, comprise a full, true and

19   correct computerized transcript of the proceedings held in the

20   above-entitled matter on Thursday, February 25, 2016.

21

22        Dated this _____ day of _____ , 2016.

23

24

25

26        _____
          Pro Tempore Reporter, CSR #13882

SCANNED

1    Eric A. Panitz, Esq. – State Bar No. 243877
     DESJARDINS & PANITZ LLP
2    18000 Studebaker Road, Suite 700
     Cerritos, CA 90703
3    Telephone: (562) 924-7800
     Facsimile: (562) 924-7801
4
     Patrick McNicholas – State Bar No. 125868
5    McNICHOLAS & McNICHOLAS, LLP
     10866 Wilshire Boulevard, Suite 1400
6    Los Angeles, California 90024-4338
     Telephone:  (310) 474-1582
7    Facsimile:  (310) 475-7871

8    Attorneys for Plaintiff
     JUDDY OLIVARES
9

F I L E D
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

FEB 2 6 2016

BY _____
SUZANNE M. SERRANO, DEPUTY

10           SUPERIOR COURT FOR THE STATE OF CALIFORNIA

11                  FOR THE COUNTY OF SAN BERNARDINO

12   JUDDY OLIVARES,  an individual,         )   Case No.: CIVDS1300810
                                             )   [Assigned for all purposes to the Honorable
                                             )   John Pacheco, Dept.S31]
13              Plaintiff,                    )   [First Amended Complaint filed:  4/12/13]
                                             )
14   vs.                                     )
                                             )
15                                           )   [PROPOSED] JUDGMENT
     SAM DASON, an individual, SAM DANIEL    )
16   DASON, DDS, A PROFESSIONAL              )
     DENTAL CORPORATION, a California        )
17   corporation doing business as COLTON    )   Trial Date:  February 25, 2016
     DENTAL GROUP, and DOES 1 through 100,   )
18   inclusive,                              )
                                             )
19              Defendants.                  )
                                             )
20   _____)

21

22          Defendant SAM DANIEL DASON, DDS, A PROFESSIONAL DENTAL

23   CORPORATION, a California corporation doing business as COLTON DENTAL GROUP,

24   having been regularly served with process, having had its answer stricken as to Plaintiff's causes

25   of action under the California Labor Code pursuant to a motion for terminating sanctions that

26   was granted by this Court on or about January 15, 2016; and,

27          As to Plaintiff's Government Code causes of action under the Fair Employment and

28   Housing Act ("FEHA"), the above-referenced matter came on for jury trial this date.  Having

                              [PROPOSED] JUDGMENT - 1

                                                    Exhibit "3" Page 1 of 4

1   been properly notified that the matter was set for trial at this date and time, and the Defendants

2   SAM DASON, an individual, SAM DANIEL DASON, DDS, A PROFESSIONAL DENTAL

3   CORPORATION, a California corporation doing business as COLTON DENTAL GROUP and

4   their counsel of record having failed to appear at trial, the Defendants' answer was stricken as to

5   the Plaintiff's causes of action under the FEHA, and on application of plaintiff to the Court, and

6   after having heard and considered the evidence, the matter was proven up by the live testimony

7   of the Plaintiff JUDDY OLIVARES and Plaintiff's psychological expert, Dr. Michael E. Kania

8   Ph.D. who testified to the Court before Hon. John M. Pacheco presiding.

9

10       The Court having considered the evidence submitted and good cause therefore appearing,

11   hereby declares that the Plaintiff is the prevailing party and orders the following judgment:

12       As to Plaintiff's Causes of Action Under the Labor Code pursuant to sections 201-203,

13   226.7, 510, and 1194 et. seq. for Unpaid Overtime, Rest Break Penalties, and Waiting Time

14   Penalties, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Plaintiff, JUDDY

15   OLIVARES have and recover from Defendants SAM DANIEL DASON, DDS, A

16   PROFESSIONAL DENTAL CORPORATION, a California corporation doing business as

17   COLTON DENTAL GROUP, the following:

18       $3,861.00          Unpaid Overtime pursuant to Labor Code §§ 510, 1194

19       $5,148.00          Rest Break Penalties pursuant to Labor Code § 226.7

20       $3,630.00          Waiting Time Penalties pursuant to Labor Code § 203

21       $5,055.60          Prejudgment Interest.

22       $17,694.60         Total Labor Code Damages

23

24       As to Plaintiff's Causes of Action Under the Fair Employment and Housing Act under

25   Government § 12940(j) for Hostile Work Environment and Quid Pro Quo Sexual Harassment, IT

26   IS HEREBY ORDERED, ADJUDGED, and DECREED that Plaintiff, JUDDY OLIVARES

27   have and recover from Defendants SAM DASON, an individual, SAM DANIEL DASON, DDS,

28   A PROFESSIONAL DENTAL CORPORATION, a California corporation doing business as

COLTON DENTAL GROUP, jointly and severally, the following:

[PROPOSED] JUDGMENT - 2

Exhibit "3" Page 2 of 4

|  |  |
|---|---|
| $300,000.00 | Past Emotional Distress Hostile Work Environment |
| $200,000.00 | Past Emotional Distress Quid Pro Quo Sexual Harassment |
| $500,000.00 | Future Emotional Distress |
| $1,000,000.00 | Subtotal |
| $100,000.00 | Punitive and Exemplary Damages *(Def, did not show up)(and although ordered)* |
| $1,100,000.00 | Subtotal |
| $1,875.00 | Future Psychiatric Care |
| $8,125.00 | Future Psychological Care |
| $6,735.22 | Past Lost Income |
| $1,116,735.22 | Total ~~Government Code~~ Damages |

As the prevailing party, Plaintiff's counsel is entitled to an award to attorneys fees pursuant to Government Code § 12965(b) and Labor Code § 1194(a) for the following hours:

Eric A. Panitz (570 hours at $420 per hour which totals $239,400.00)

Patrick McNicholas (50 hours at $800 per hour which totals $40,000.00)

Paralegal time (139 hours at $120 per hour which totals $16,680.00)

Based on the experience and performance of the above mentioned legal practitioners, and the Court having considered the Declaration of Eric Panitz, and other evidence regarding experience of Eric Panitz and Patrick McNicholas, considers the above listed hourly rates reasonable and approves the time spent by each. In addition to the foregoing, the Court, having considered the difficulty of the matter, the risks inherent to a contingent matter of this type, and taking into account the sharp tactics employed by Defendants, hereby orders that a Lodestar multiplier of 2.0 on attorney's fees is appropriate in this case.

Therefore, pursuant to Plaintiff's right as the prevailing part to recover attorney's fees and costs pursuant to statute, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Plaintiff, JUDDY OLIVARES have and recover from Defendants SAM DASON, an individual, SAM DANIEL DASON, DDS, A PROFESSIONAL DENTAL CORPORATION, a California corporation doing business as COLTON DENTAL GROUP, jointly and severally, the following:

$592,160.00    Attorney's Fees ($296,080 times 2.0 Lodestar multiplier)

[PROPOSED] JUDGMENT - 3

Exhibit "3" Page 3 of 4

| | |
|---|---|
| $8,274.50 | Expert Witness Fees |
| $6,330.86 | Deposition Transcript Costs |
| $1,361.81 | Filing Fees |
| $26.95 | Fax Filing Costs |
| $107.00 | Service of Process Costs |
| $608,261.12 | Total Attorney's Fees and Costs |

Based on the foregoing the Court hereby enters a total judgment, as proved up during the Court hearing held on February 25, 2016 as follows:

**$ 1,742,690.94    TOTAL JUDGMENT**

**PLUS DAILY INTEREST AT $477.45 PER DAY**

OF THIS TOTAL AMOOUNT, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Plaintiff, JUDDY OLIVARES have and recover from Defendants SAM DASON, an individual, SAM DANIEL DASON, DDS, A PROFESSIONAL DENTAL CORPORATION, a California corporation doing business as COLTON DENTAL GROUP, jointly and severally, the total amount of $1,724,996.34, and that the balance of $17,694.60 shall be due and payable solely by SAM DANIEL DASON, DDS, A PROFESSIONAL DENTAL CORPORATION, a California corporation doing business as COLTON DENTAL GROUP.

IT IS SO ORDERED, ADJUDGED AND DECREED

DATED: 2/26/16 _____

JOHN M. PACHECO
JUDGE OF THE SUPERIOR COURT

[PROPOSED] JUDGMENT - 4